# Ellen Adams Cabot v. Thomas D. Cabot, III

[697 A.2d 644]

No. 96-087

Present: Gibson, Dooley, Morse and Johnson, JJ., and Skoglund, D.J., Specially Assigned

Opinion Filed May 23, 1997

Motion for Reargument Denied July 2, 1997

*Debra R. Schoenberg*, Burlington, *Nicholas E. Tishler*, Niskayuna, New York, and *Robert P. Davison, Jr.* (On the Brief), Stowe, for Plaintiff-Appellant.

*Susan M. Murray* and *Peter F. Langrock* of *Langrock Sperry & Wool*, Middlebury, for Defendant-Appellee/Cross-Appellant.

**Johnson, J.** In this decision we address a number of issues arising out of a lengthy and complicated divorce proceeding. Both parties appeal the family court's parental rights and responsibilities order; the husband, Tom, claims that he should have been awarded sole parental rights, while the wife, Ellen, argues that the court lacked authority to award joint legal parental rights and responsibilities absent agreement of the parties. Ellen also appeals a number of financial issues, including the court's valuation and division of the marital estate and its failure to award maintenance. We agree that the court lacked authority to award joint legal parental rights and responsibilities and therefore reverse and remand the parental rights and responsibilities order; in all other respects, we affirm the decision below.

The parties were married in 1984 and have lived in Vermont throughout their marriage. They have one child. Ellen has worked as a registered nurse and has operated her own nutrition business, but has not worked outside the home since the child's birth. Tom has his own business as architect and real estate developer, but has not had much financial success. Although neither party earned any substantial income during the marriage, the family lived very well, supported by income derived from Tom's family inheritance. The parties began to live apart in late 1991, and the divorce was filed in April 1992. Over the next three-and-a-half years, the parties litigated every aspect of this divorce, culminating in the separate parental-rights-and-responsibilities and property-distribution orders that are the subject of this appeal. As we address each of the arguments raised by the parties, we explain the relevant factual and procedural background in more detail.

## I. Parental Rights and Responsibilities

The parties' only child, a daughter, was born in 1988. For the first three-and-a-half years of the child's life, the family lived together in the marital home in Shelburne, Vermont. In the fall of 1991, however, the marriage began to disintegrate. Ellen asked Tom first to spend four nights a week at a nearby house owned by Tom and his sister; two months later, she asked him to move out of the house altogether. For several months, the parties remained in couples therapy and Tom continued to see the child. In March of 1992, Ellen insisted that Tom reduce his time with the child from daily contact to three visits per week. Ellen also stopped attending couples therapy. In April 1992, Ellen filed for divorce. On the same day that she began the divorce proceedings, she took her daughter to her parents' house in Maine without telling Tom.

Shortly thereafter, the parties entered into a stipulation giving Ellen temporary, primary physical rights and responsibilities subject to Tom's right to certain parent-child contact. The trial court incorporated that agreement into a temporary order. In June 1992, less than two months after the court issued its order, Ellen refused to allow Tom to see the child. Ellen testified that she believed Tom was removing items of personal property from the marital home during the visits, and claimed that her then-attorney advised her to stop the visits. The court noted that Ellen's explanation "seem[ed] questionable" and found it more likely that Ellen's conduct was a deliberate attempt to reduce or sever Tom's contact with the child. As a result of Ellen's actions, Tom had no contact with his child for nearly four months. In October 1992, the court ordered Ellen to allow contact between Tom and the child, but on the advice of the child's psychiatrist, that contact was limited at first to a few hours twice a week in the presence of a third-party observer.

In July of 1993, Ellen told Tom that she had accepted a nursing job in Charlottesville, Virginia, and had placed a deposit on a house and enrolled the child in school there. Ellen planned to move in September of that year. Tom requested that the trial court enjoin Ellen from taking the child with her to Virginia. The court granted the motion, and Ellen decided not to move to Virginia. Ellen testified, however, that she planned to move to Virginia after the divorce was final.

In October of the same year, Ellen filed a motion asking the trial court to reduce Tom's contact with the child. After a discussion between the attorneys and the court, the hearing on Ellen's motion was transformed into a final hearing on parental rights and respon-

sibilities. The court decided to adjudicate that issue before considering the property and maintenance issues, in part because of Ellen's plan to move to Virginia with the child.

After making extensive findings,[1] and evaluating each of the factors listed in 15 V.S.A. § 665(b), the court awarded sole physical parental rights and responsibilities to Ellen, but ordered joint legal parental rights and responsibilities. The court also granted Tom substantial parent-child contact, including every other weekend, shared or alternated school vacations, and forty-five days during the summer. The court drew up an alternate visitation schedule, should Ellen move to Virginia or another distant state; under that plan, the child would be with Tom for every school vacation and almost all of the summer.[2] Each parent challenges some part of the court's parental-rights-and-responsibilities order. Tom argues that he should have been awarded sole parental rights and responsibilities, while Ellen maintains that the court erred by ordering joint legal parental rights and responsibilities.

## A. Tom's Claim

We first address Tom's claim that the trial court abused its discretion by failing to award him sole legal and physical parental rights and responsibilities. Tom does not challenge any of the court's findings, but instead argues that those findings do not support its decision to award physical rights and responsibilities to Ellen. Specifically, Tom points to several findings regarding Ellen's attempts to limit or eliminate Tom's contact with the child and to interfere with the father-child relationship. Based on these findings, the court concluded that, if awarded primary legal rights and responsibilities, Tom would be much more likely to support and foster the child's relationship with Ellen than Ellen would be to encourage the child's relationship with Tom. See 15 V.S.A. § 665(b)(5) (one factor court must examine is "ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the

---

[1] Ellen argues that this Court should strike as clearly erroneous a number of the findings made by the trial court in its parental-rights-and-responsibilities order, but she does not explain how her argument on this point relates to the relief she seeks on appeal. At any rate, after examining the record, we conclude that the court's findings are supported by the evidence.

[2] In her brief, Ellen argues that the court's alternate plan for parent-child contact unfairly punishes her for moving out-of-state. At oral argument, her counsel withdrew this claim, and we do not address it here.

other parent"). The court also concluded that Tom is able and willing to provide the child with love, affection, and guidance; to ensure that her basic physical needs are met; and to meet her present and future developmental needs. See 15 V.S.A. § 665(b)(1)-(3) (court must consider these factors in making custody determination). In Tom's view, these findings and conclusions by the court mandated an award of sole parental rights and responsibilities to him.

The court based its decision to award physical parental rights and responsibilities to Ellen on its conclusion that Ellen has been the child's primary care provider, "clearly fulfill[ing] this role more than Tom," both before and after the separation. See 15 V.S.A. § 665(b)(6) (court shall consider quality of child's relationship with primary care provider, if appropriate, given child's age and development); *Johnson v. Johnson*, 163 Vt. 491, 494, 659 A.2d 1149, 1151 (1995) (absent evidence on likely effect of change of custodian, court should ordinarily find that child should remain with primary custodian if that parent is fit). The court found that Ellen "was the central figure in [the child's] life," and that "the depth of the emotional relationship between Tom and [the child] does not equal that between [the child] and Ellen." Despite Ellen's unfortunate efforts to disrupt the child's relationship with her father, the court was reluctant to break the close mother-daughter bond.

We do not agree with Tom that, based on the court's findings, the court abused its discretion by failing to award sole parental rights and responsibilities to him. See *deBeaumont v. Goodrich*, 162 Vt. 91, 103, 644 A.2d 843, 850 (1994) (trial court has broad discretion in custody matter; Supreme Court cannot set aside its decision because it would have reached different conclusion from facts); *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988) (Supreme Court must affirm trial court's decision in custody matter unless that court's discretion was erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of evidence). The court recognized and considered Ellen's attempts to exclude Tom from the child's life, but on balance concluded that Ellen's role as primary care provider and the need to preserve the resulting "close, warm, nurturing, and consistent relationship" between Ellen and her daughter outweighed the other concerns. Overall, the evidence supports the court's decision to grant sole physical parental rights and responsibilities to Ellen rather than Tom. See *Bissonette v. Gambrel*, 152 Vt. 67, 70, 564 A.2d 600, 601-02 (1989) (court did not err by awarding custody to mother, who was primary

care provider, despite evidence that mother's animosity and rebuff of father made it difficult for father to participate in child's care).

■ Tom also argues that, by awarding Ellen sole physical parental rights and responsibilities, the court sanctioned what he calls Ellen's "deliberate scheme" to exclude him from the child's life and establish herself as the primary care provider. The findings do not support Tom's claim that Ellen "acquired" her status as primary care provider by limiting, and for a period cutting off completely, contact between Tom and the child. The court specifically found that Ellen has been the primary care provider from the birth of the child; although she sought to become the sole care provider after the parties filed for divorce, she was the primary care provider even before the separation. Moreover, the court neither sanctioned nor ignored Ellen's misconduct, but stated that Ellen needed to change her attitude toward Tom and his relationship with the child. In making its decision, however, the court appropriately focused on "the best interest of the child, not equity between the parties." *Id.* at 70, 564 A.2d at 602; see also *Orr v. Orr*, 122 Vt. 470, 473, 177 A.2d 233, 235 (1962) (welfare of child is paramount concern; opposing desires of hostile parents, insofar as they conflict with well-being of child, must yield). The court was not free to punish Ellen for her behavior or reward Tom for his, but instead had to be guided by the needs of the child. See *Nickerson v. Nickerson*, 158 Vt. 85, 90, 605 A.2d 1331, 1334 (1992) (attention should be focused on needs of child rather than actions of parents).

## B. Ellen's Claim

Ellen challenges the court's award of joint legal parental rights and responsibilities. She argues that this provision of the court's order violates 15 V.S.A. § 665(a), which states in part: "When the parties cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." As Tom and Ellen did not form an agreement to divide or share their parental rights and responsibilities, see 15 V.S.A. § 666, Ellen maintains that the court lacked authority under the statute to make a joint award.

The court justified its order by noting that the parties, despite their many arguments, for the most part agree on the major issues affecting the child's welfare. The court emphasized that the parties have similar backgrounds and values, as well as similar aspirations for the child's future. Despite the parties' lack of agreement, and their

frequent disputes over the child, the court concluded that it was "worth a try" to entrust the couple with joint legal parental rights and responsibilities, and ordered that "[e]ach shall involve the other in decisions regarding [the child's] health, education, religion, and welfare."

■ We agree with Ellen that the court exceeded its authority by ordering joint legal parental rights and responsibility. A joint parental rights and responsibilities order such as this one violates both the language of § 665(a) and the policy underlying the provision. The meaning of § 665(a) is plain: where the parents cannot agree, the court must award primary (or sole) parental rights and responsibilities to one parent. Here, the court's order cannot be characterized as awarding primary parental rights and responsibilities to Ellen. Although Ellen, as the parent with sole[3] physical rights and responsibilities, is primarily responsible for the "routine daily care and control of the child," see 15 V.S.A. § 664(1)(B), she can make no important decisions on behalf of the child without consulting and reaching agreement with Tom. Neither she, nor Tom, has primary responsibility for this child; rather, they have been forced to share that responsibility.[4] Under the statute, the court does not have authority to order this arrangement absent the consent of the parents.

---

[3] Although the court's order grants Ellen "sole" physical rights and responsibilities, it also grants Tom substantial parent-child contact. The child may spend one-fourth to one-third of her time with Tom. Under these circumstances, the order may be better described as granting Ellen "primary" physical rights and responsibilities.

[4] The dissent argues that the court awarded parental rights and responsibilities "primarily" to Ellen because it awarded her the greater share of those rights and responsibilities — that is, while the parties share legal parental rights and responsibilities equally, Ellen received most of the physical rights and responsibilities. On this view, § 665(a) means nothing more than that one parent must receive more than fifty percent of the parental rights and responsibilities. We do not believe that the Legislature intended this result. This provision is the Legislature's response to those parents who "*cannot agree* to divide or share parental rights and responsibilities." 15 V.S.A. § 665(a) (emphasis added). The Legislature recognized that where parents cannot work together, one parent must be given primary responsibility to make decisions on behalf of the child. In terms of the statute, this means that a court cannot award joint legal parental rights and responsibilities to parents who do not agree to such an award.

We see no basis to the dissent's claim that we have "distort[ed] the language," 166 Vt. at 506, 697 A.2d at 658, of this provision. Our decision is based on the statute's explicit requirement that court must "award parental rights and responsibilities primarily or solely to one parent." *Id.* In our view, the word "primarily" does not permit the court to force parents to share responsibility for all major decisions affecting a child.

Our reading of § 665(a) as prohibiting an award of joint legal parental rights and responsibilities absent agreement of the parties is reinforced by the provisions of § 666, which governs agreements between parents. This statute requires parents who do agree to share or divide parental rights and responsibilities to complete an agreement that addresses, among other things, procedures for communicating about the child's welfare and for resolving disputes, see 15 V.S.A. § 666(b)(6) & (7) — issues that, ironically, the court did not discuss in its order in this case. By requiring parents who are willing to work together to nonetheless consider and resolve these issues in advance, the Legislature recognized the difficulties inherent in shared-parenting arrangements. In light of these provisions, it seems unlikely that the Legislature intended to allow courts to force such an arrangement on parents.

We recognize that the court in this case was frustrated by Ellen's' violation of its earlier order and by her unwillingness to foster Tom's relationship with the child. The court tried to ensure Tom's meaningful involvement in the child's life by requiring Ellen to share decision-making authority with him. But a court-imposed joint-parenting arrangement cannot solve the problem of fighting parents. Instead, by forcing unwilling parents to share parental rights and make joint decisions, a court risks placing a child in the middle of constant and harmful disputes over everything from how much television the child watches to what school or church the child attends. Divorced or separated parents who agree to share responsibility for their children take on, to their credit, a challenging task requiring communication, cooperation, and flexibility. Where parents have not evinced a willingness to work together, they are very unlikely to successfully negotiate this process.[5]

As we recognized in *Gazo v. Gazo*, 166 Vt. 434, 697 A.2d 342 (1997), awarding primary parental rights and responsibilities to one

---

[5]The dissent argues that our decision undermines the Legislature's declaration that providing opportunities for the children of divorced parents to "have . . . maximum continuing physical and emotional contact with both parents" serves the children's best interests. 15 V.S.A. § 650. We fully agree with this policy, and our decision in no way suggests that family courts should not award shared parental rights and responsibilities in appropriate cases. The dissent is absolutely correct that children benefit when their parents continue to cooperate and share parenting responsibilities following a divorce. Where we part company is on courts' authority when parents do not agree to share parental rights. Consistent with the statute, parents may not be forced to this result, creating a situation in which each decision will be a source of further conflict and trauma for the child.

parent does not mean that the other parent must be completely shut out of decision-making about the child. If it serves the best interests of the child, the court may, for example, require the primary parent to consult with the other parent on some issues. See *id.* at 443, 697 A.2d at 347. The court may also award substantial parent-child contact to the noncustodial parent. Thus, we do not view our decision as requiring the court to take an "all or nothing" approach, 166 Vt. at 507, 697 A.2d at 658, as suggested by the dissent. As always, family courts have broad discretion to craft parental rights and responsibilities orders that serve the best interests of children.

Although we strike the provision awarding joint legal parental rights and responsibilities, we recognize that the family court may wish to alter other provisions in the order. We therefore remand the parental rights and responsibilities order for reconsideration in light of this opinion.

## II. Value of Marital Property

The court assigned the parties' marital estate, including several pieces of real estate, business property, and investments, a gross value of $7.1 million and a net value of $4.3 million. Ellen challenges a number of the court's findings regarding the values of different assets and also argues that the court improperly considered potential future tax liability when it calculated the net value of the marital estate. We address each of Ellen's arguments in turn.

## A. Net v. Gross Marital Estate

Ellen's most substantial claim is that the court erred by reducing the value of certain assets to reflect potential tax consequences of a sale of those assets. She relies on *Johnson v. Johnson,* where we stated that "the tax status of assets in the hands of one of the parties should not affect their fair market valuation, unless the decree necessitates their sale." 158 Vt. 160, 165, 605 A.2d 857, 860 (1992). In that case, we held that the trial court erred by relying on the wife's nonexpert testimony on the possible impact of tax law on the sale of her interest in two limited partnerships, and remanded the matter for reconsideration of the fair market value of those assets. *Id.* at 164-65, 605 A.2d at 860.

For several reasons, we are not persuaded that our holding in *Johnson* compels reversal in this case. First, we noted in *Johnson* that, although potential income taxes do not affect the value of a

marital asset, "they 'may be another factor to consider in establishing the amount and method of payment of any monetary award.'" *Id.* at 165, 605 A.2d at 860 (quoting *Rosenberg v. Rosenberg*, 497 A.2d 485, 503 (Md. Ct. Spec. App. 1985)). In this marriage, the primary marital asset was Tom's substantial investment account with Paine Webber, which the court found had a market value of close to $4 million dollars. Throughout the marriage, the parties funded their lifestyle by borrowing against this account; that way, the parties enjoyed the benefit of the growth in the investments without paying taxes on the gain. The parties have been able to live on "paper wealth" for many years, because their investments have performed well. A downturn in the market, however, could force Tom to sell investments to repay the debt; in so doing, he would incur substantial tax liability because of his low basis. In light of the parties' unusual financial situation, potential tax liability was relevant to the court's overall evaluation of their finances.

Moreover, Ellen requested and received a cash award as her share of the marital property. Had she received real estate or stocks of comparable value, and wished to liquidate those assets, she would have faced large tax payments. Instead, she received the full benefit of her award, with no need to worry about future tax problems. As the court noted, however, Tom presumably had to liquidate assets to pay Ellen, and consequently incurred tax liability on the sales. And, as Tom retains the investment account, he also bears the risk that a market downturn will force him to sell some investments and pay taxes on the gain. Under these circumstances, it was not unreasonable for the court to consider potential tax consequences associated with assets in the marital estate. See *id.* at 165, 605 A.2d at 860 (in interests of fairness and consistency, court may consider specific, relevant, and material evidence about transaction taxation of assets in determining value, division, and method of allocation of parties' assets).

Finally, even if the court underestimated the net value of the marital estate by deducting potential tax liability, the error was not relevant to its decision and was therefore harmless. As the spreadsheet attached to the court's decision reveals, the court was well aware of both the gross and net values of the parties' assets. The court did not award Ellen a fractional share of the estate, but instead calculated an award that would generate an appropriate income, given the duration of the marriage and the standard of living during the marriage. We are convinced, based on the court's thorough

discussion of the issue, that redefining the net value of the estate would not change the court's decision. As discussed above, the court would still properly consider the potential tax liability in making its decision. The change would be merely cosmetic.

## B. Value of Real Estate

Next, Ellen contests the court's findings regarding several pieces of real estate. We reject her attempt to relitigate the parties' factual disputes. On appeal, this Court does not disturb the findings of the trial court "unless, viewing the evidence in the light most favorable to the prevailing party and excluding the effect of modifying evidence, a finding is clearly erroneous." *Semprebon v. Semprebon,* 157 Vt. 209, 214, 596 A.2d 361, 363 (1991). Disregarding this standard, Ellen essentially argues that this Court should accept evidence that was rejected by the trial court. That court found that a number of values suggested by Ellen were "inflated," some "grossly," and that others were "simply without foundation." Moreover, the court was not impressed by the testimony of the real estate broker who served as an expert witness for Ellen, finding that many of the broker's property valuations were "wide of the mark." As the trier of fact, it was the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence. *Bruntaeger v. Zeller,* 147 Vt. 247, 252, 515 A.2d 123, 126 (1986); see also *Kanaan v. Kanaan,* 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (trial court's findings accorded wide deference on review because court is in unique position to assess credibility of witnesses and weight of evidence); *Mullin v. Phelps,* 162 Vt. 250, 261, 647 A.2d 714, 720 (1994) (role of Supreme Court in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo).

Addressing Ellen's specific claims, we first note that the values assigned by the court to Pheasant Hill Lot 4, Bayview Lot 3, and Bayview Lot 4 fell somewhere between the values claimed by the broker and those claimed by Tom. The court was within its discretion to choose a value within the range of the evidence presented. *Semprebon,* 157 Vt. at 214, 596 A.2d at 364. The court accepted Tom's testimony that a so-called Bayview Orchestra Lot did not exist. And finally, the court was understandably skeptical of the broker's values for the Pheasant Hill Reserve Building Lot and the Black Walnut lots, as she based her calculations on the assumption that the lots were approved and available for sale. The broker admitted on cross-

examination that the Reserve Building Lot was not permitted and that her purported "valuation" was not in fact the market value of the lot as it existed at the time of the trial. Tom, in turn, testified that the Reserve Building Lot was held in common by all the Pheasant Hill lot owners, and could not be developed without their unanimous consent; that most of the Black Walnut lots are the subject of a pending agreement with nearby landowners that would restrict development on those lots; and that one of the Black Walnut lots has no available place for a septic system, and may actually become a liability for Tom. Based on this evidence, the court's findings that the Reserve Building Lot had no value as a separate lot and that the "possibility of a positive financial return on the Black Walnut lots [wa]s too remote for inclusion in th[e] marital estate" are not clearly erroneous. See *Kanaan*, 163 Vt. at 407, 659 A.2d at 132 (court not bound to follow opinions of expert witnesses); *Bruntaeger*, 147 Vt. at 252, 515 A.2d at 126 (trial court's factual determinations will stand if supported by credible evidence, even if inconsistencies or contrary evidence exist).

## C. Other Marital Property

Ellen's other challenges to the trial court's findings are similarly without merit. She argues that the court erred by omitting Chestnut Street Exchange securities worth over $400,000 from its valuation of the Paine Webber account. During the trial, the court discussed with counsel for both parties the difficulty of valuing the account, given the daily changes in stock prices. The court asked the parties to stipulate to Paine Webber's stated value of the account as of February 28, 1995, the first day of trial on the financial issues. See *Kanaan*, 163 Vt. at 410, 659 A.2d at 134 (as general matter, marital assets should be valued as close to date of trial as possible). Tom's attorney agreed to obtain a statement from Paine Webber showing the value of the entire portfolio and the debt owed on it as of that date, and stated that "if there's any objection to that copy in any way, [Ellen's attorney will have] an opportunity to tell me." Two days later, during Tom's direct testimony, Tom identified a document as a statement from Paine Webber showing the market value of the account as of February 28, 1995 to be approximately $4 million, and the debt on that date to be approximately $2 million. Ellen's attorney did not object to the admission of the document as evidence, nor did he raise the question of the Chestnut Street securities during his cross-examination of Tom or at any other time during the trial. On appeal, Ellen points to another Paine Webber statement which shows a market value of $4.4

million. This document was submitted to the court by Ellen's attorney after the end of the trial, and was not admitted as evidence. Although Ellen may be correct that the statement introduced at trial understated the value of the account, the proper time to challenge those figures was during the trial. The court's findings, which adopt the lower figures, are based on the evidence and are not clearly erroneous.

■ The court's valuation of Tom's interest in The Waterfront Company, a limited partnership that owns commercial real estate in downtown Burlington, is also supported by the evidence. The court rejected Ellen's proposed valuation of the company as "not . . . at all credible." The court found that the company had not performed well and had substantial debt. On paper, the company owes Tom, the general partner, several hundred thousand dollars. The court found, however, that if Tom attempted to collect that debt before repaying the limited partners' investments, the limited partners would sue him. As we have recognized in an analogous situation, the court faced a difficult task in valuing this asset; the market value of a share in a partnership, like the value of a closely held business, may be difficult to fix precisely. See *Kanaan*, 163 Vt. at 407, 659 A.2d at 132. Given the evidence before the court, its decision to value Tom's interest in the company at $100,000 was not clearly erroneous.

■ Finally, Ellen complains that the court erred in relying on "post-hearing" evidence in valuing certain personal property, specifically three automobiles, some inoperable, and a motorcycle. Although the court acknowledged that, after the hearing, the items were sold for far less than either Ellen's or Tom's values for them, the court did not value the items at the sale price. Instead, the court adopted Tom's values. Again, the court in its discretion may choose a value for an asset that is within the range of the evidence presented. *Semprebon*, 157 Vt. at 214, 596 A.2d at 364.

## III. Property Division and Maintenance

Next, Ellen challenges the court's division of the marital property and its failure to award her maintenance. The court concluded that the marital estate contained sufficient value to provide financial independence for each of the parties, and awarded Ellen slightly more than $1.5 million, mostly in cash. The court found that maintenance was unnecessary, because "Ellen's income and [the] property award [would] be sufficient for her reasonable needs [and enable her] to

support herself at the standard of living established during the marriage." As the court's property and maintenance decisions are linked, Ellen's claims with respect to these issues must be considered together. See *DeGrace v. DeGrace*, 147 Vt. 466, 470, 520 A.2d 987, 990 (1986) (property division and maintenance award are closely related under Vermont's statutory scheme).

Division of marital property is governed by 15 V.S.A. § 751, which grants the court authority to "equitably divide and assign the property" and sets out a number of factors that the court may consider in making its decision. See *Jakab v. Jakab*, 163 Vt. 575, 585, 664 A.2d 261, 267 (1995). As we have often noted, property division is not an exact science, and the trial court has broad discretion in considering the statutory factors and fashioning an appropriate order. See, e.g., *Klein v. Klein*, 150 Vt. 466, 469, 555 A.2d 382, 384 (1988). The court must, however, provide a clear statement as to what was decided and why. *Jakab*, 163 Vt. at 585, 664 A.2d at 267.

In her brief, Ellen challenges the court's conclusions with respect to a number of the statutory factors. She has not, however, succeeded in demonstrating an abuse of discretion by the court. See *id.* at 585, 664 A.2d at 267 (court's decision will be upheld unless its discretion was abused, withheld, or exercised on clearly untenable grounds). For the most part, the arguments are nothing more than a recital of evidence, such as that of Ellen's claimed contributions to Tom's business activities, that the court rejected as not credible.

In any event, Ellen does not link these arguments to a request for a larger share of the marital estate. Instead, she argues that this Court should "add back" the assets that she claims were erroneously excluded or undervalued by the trial court, and then divide this revalued marital estate using the same ratio that the trial court employed. As we have already discussed, however, the court's factual findings regarding the value of the marital estate were not clearly erroneous, and we will not disturb them. Moreover, the court did not award Ellen a "share" of the marital estate; it calculated a cash award that it considered appropriate given the relevant statutory factors. The court's decision, which is well-explained and supported by the findings, is not an abuse of discretion.

Ellen further claims that the court should have awarded her maintenance pursuant to 15 V.S.A. § 752. Although a court may award significant amounts of both property and maintenance, see *Johnson v. Johnson*, 155 Vt. 36, 43, 580 A.2d 503, 507 (1990), a court

also has discretion to make an award of property in lieu of maintenance. *Naumann v. Kurz*, 152 Vt. 355, 358, 566 A.2d 1342, 1344 (1989); see 15 V.S.A. § 752(a)(1) (court may order maintenance if it finds that spouse seeking maintenance lacks sufficient income, property, or both, including property apportioned by court, to provide for reasonable needs). In this case, given the substantial size of the marital estate, the court chose to divide the marital property to allow each party financial independence. Ellen does not necessarily challenge this approach, but considers her property settlement too small to be an adequate substitute for maintenance payments in this case.

The focus of Ellen's claim is that the court did not give adequate consideration to the standard of living established during the marriage. See 15 V.S.A. § 752(a)(1) & (2) (court may order maintenance if it finds that spouse seeking maintenance cannot provide for reasonable needs and cannot support herself at standard of living established during marriage). She takes issue with the court's characterization of the parties' lifestyle during the marriage as "inappropriate" and argues that the court had no authority to consider whether she and Tom were living beyond their means. According to Ellen, the court should have awarded her sufficient maintenance and/or income-producing property to allow her to spend as she did during the marriage, even if that spending level was unreasonable given the parties' income and assets.

 Although the court must consider the standard of living established during the marriage, we cannot conclude that the Legislature intended courts to ignore economic reality in these situations. A couple may, if they are able to obtain credit and choose to do so, live an extravagant lifestyle that they cannot afford. But such a financial arrangement cannot last forever, and it can rarely last beyond a divorce, when property and income must be split to support two households. See *Kohut v. Kohut*, 164 Vt. 40, 43, 663 A.2d 942, 944 (1995) (where parties were constantly borrowing money and receiving assistance from husband's parents during marriage, it was unlikely that their lifestyle was sustainable after divorce). Indeed, Ellen's financial demands prove this point well: her request for over $2.3 million in cash would have more than wiped out the investment account, forcing Tom to liquidate other assets to pay her and pay the taxes, and leaving very little, if any, income-producing property to fund her request for $48,000 per year combined maintenance and child support. The court correctly concluded that these demands were "unreasonable."

■ In light of the property settlement, the court did not abuse its discretion in failing to award maintenance to Ellen. Ellen received sufficient cash to pay her attorney's fees, purchase a home worth approximately $200,000, and still invest $1,000,000. The income stream from that investment, combined with $18,000 per year in child support to provide for the child's needs, should allow Ellen a very comfortable standard of living. We see no grounds that justify disturbing the court's decision. See *Johnson*, 155 Vt. at 40, 580 A.2d at 506 (party appealing maintenance decision must show that there is no reasonable basis to support it).

## IV. Other Issues

### A. Child Support Order

■ The court, noting that the parties had not presented sufficient evidence to calculate the support amount based on the guidelines, did not attempt such a calculation or make findings on the issue. Instead, the court estimated a monthly support amount of $1500, and invited the parties, if they wished to litigate the issue, to request a hearing before the magistrate. See 4 V.S.A. § 461(a)(1) (magistrate has jurisdiction to hear proceedings for establishment, modification and enforcement of child support). Although unusual, the court's order was reasonable under the circumstances. The $1500 estimate was not significantly higher than the $1350 per month set in a temporary order in 1992; moreover, the court may have believed that the parties would prefer to accept the estimate rather than engage in another expensive legal dispute. In any event, if one of the parties was dissatisfied, she or he could take the issue to the magistrate for resolution.

Disregarding this instruction, Ellen instead seeks to contest the child support order on appeal. She argues that Tom should be required to pay $2000 a month in child support, rather than $1500 as ordered by the court. This Court, however, is in no better position than the trial court to determine the appropriate amount of child support. If the parties wish to continue this dispute, they should present their evidence and arguments to the magistrate.

### B. Legal Fees

Both parties are dissatisfied with the court's handling of Ellen's legal fees. To facilitate the parties' financial independence, the court issued an interim final order that required Tom to pay Ellen $1.25

million in cash and stated that "[e]ach party shall be responsible for his or her own counsel and expert witness fees." In the final property distribution order, the court concluded that "an additional and final award of $200,000 is sufficient to cover [Ellen's] litigation costs and will leave her with ample money to buy a home."

■ Tom claims that the court erred by awarding Ellen $200,000 for attorney's fees when she only requested $104,600. We do not, however, read this portion of the court's order as an award of attorney's fees. The court had previously stated that Tom and Ellen would be individually responsible for those costs. In the final order, the court calculated an additional cash award that would cover Ellen's obligations and the purchase price of a new home, and still leave her with $1,000,000 to invest. The court decided that $200,000 would be an appropriate amount. There was no error.

■ Ellen, for her part, argues that the court erred by failing to require Tom to pay attorney's fees due under a temporary order that predated the interim order. We see no merit in this claim. The temporary order was superseded by the interim order, which gave Ellen responsibility for her own attorney's fees, and by the final property distribution order, which considered Ellen's unpaid litigation costs in calculating the final award. Tom has no further obligation to pay for Ellen's attorney's fees.

## C. Role of Presiding Judge

■ Although she does not explain what relief she seeks, Ellen claims that the trial judge erred by continuing to preside over this matter after his term in family court ended. According to Ellen, she was prejudiced by the judge's continuing role in this case because of his "hostility" toward her. This claim borders on the frivolous. Our rules plainly state, and we have previously recognized, that "the expiration of a term does not affect a judge's power over a case that has been pending before the judge." *DeGrace*, 147 Vt. at 469, 520 A.2d at 989; see V.R.C.P. 6(c) (expiration of term of court in no way affects power of court to do any act or take any proceeding in any civil proceeding that has been pending before it). Moreover, our review of the record does not reveal any bias or prejudice on the part of the judge. Indeed, the judge exhibited remarkable patience with the attorneys and the parties during these protracted and vehemently disputed divorce proceedings.

*The parental rights and responsibilities order is reversed and remanded for further proceedings not inconsistent with this opinion. In all other respects, the decision below is affirmed.*

**Morse, J.,** concurring. While I concur in the holding, I write separately to discuss one aspect of the joint custody issue.

I readily agree with the Court's conclusion that divorced parents must manifest an ability to cooperate and compromise over basic child-care decisions to warrant an award of joint rights and responsibilities. Any other conclusion would be contrary to the best interests of the children, who should not be subjected to ongoing parental strife and continual judicial intervention. Amid such disharmony, the family court's only reasonable option is to award parental rights and responsibilities "primarily or solely" to one parent. 15 V.S.A. § 665(a).

Even in such cases, however, there may exist circumstances that would warrant the court reserving a specific, discrete area of parental responsibility for the noncustodial parent. The statutory scheme specifically contemplates such an award. See *id.* § 665(d) (court may order parent who is awarded responsibility for "a *certain* matter involving a child's welfare" to inform other parent when major change occurs) (emphasis added). A case where the noncustodial parent feels very strongly about religious upbringing while the custodial parent is neutral or perhaps even assents to the wishes of the other is a good example. Although the situation might otherwise not be suitable for an award of joint custody, it might be appropriate to award rights and responsibilities generally or *"primarily . . .* to one parent," *id.* § 665(a) (emphasis added), while awarding a specific area of responsibility to the other. As we recognize in *Gazo v. Gazo,* 166 Vt. 434, 697 A.2d 342 (1997), the absence of complete parental agreement "does not mean that the only alternative is an award of all rights and responsibilities solely to one parent. The use of the word 'primarily' shows that the Legislature expected that some sharing of responsibilities, short of joint custody, could be ordered." *Id.* at 443, 697 A.2d at 347.

In the appropriate case there may be advantages to such an award. Chief among them is fostering the noncustodial parent's sense of responsibility. The parent remains involved with the child not only in the physical sense of visitation, but also in the broader emotional sense of retaining responsibility for an aspect of the child's upbringing. Enhancement of the parent-child relationship, and ultimately

better cooperation between the parents themselves, are also potential long-term benefits. Thus, such an order, where appropriate, serves the express legislative goal of ensuring that the children of divorce continue "to have the opportunity for maximum continuing physical and emotional contact with both parents." 15 V.S.A. § 650.

Accordingly, while I concur in today's decision, I believe it is important that it not be interpreted to preclude custodial awards of the kind outlined above.

**Skoglund, D.J.,** Specially Assigned, concurring and dissenting. I disagree only with the majority's holding that the family court exceeded its authority by awarding joint legal parental rights and responsibilities. The holding ignores the plain meaning of 15 V.S.A. § 665(a), which requires the court to award parental rights *primarily* or solely to one parent when the parents cannot agree to share those rights. Worse, it provides further incentive for divorcing parents who are primary caregivers to refuse to cooperate with their spouses on sharing parental rights and responsibilities, and thus undermines the Legislature's stated policy of furthering children's best interests by maximizing their continuing physical and emotional contact with both parents following divorce. 15 V.S.A. § 650.

One need look no further than the instant case to see the negative impact of today's ruling. The family court found that although Tom had demonstrated good parenting skills and enjoyed a healthy relationship with his daughter, the child had begun to exhibit signs of Parental Alienation Syndrome as the result of Ellen's attempts to alienate her from her father. Despite being contented and happy while at her father's house, the child repeatedly told her mother that she hated her father and that she did not want to spend time with him. As the court found based on expert testimony, the child was reacting to Ellen's hostility toward Tom by telling her mother what she wanted to hear.

Recognizing both that the child was being negatively affected by Ellen's efforts to alienate her from her father and that the resulting parental alienation, if left unchecked, had the potential to destroy the father-daughter relationship, the court concluded that the family's principal problem — the stress caused by Ellen's attempts to remove Tom from the child's life — would be best resolved by a change in Ellen's attitude rather than the destruction of the child's relationship with her father. Thus, the court determined that while it would be in the child's best interest to remain with Ellen, her lifelong primary caregiver, the parties should share legal rights and responsibilities to

allow Tom to have a continuing meaningful involvement in his daughter's life.

The court concluded that this arrangement was possible because, ironically, notwithstanding Ellen's attempts to undermine the child's relationship with her father, the parties had generally been cooperative in matters concerning their daughter. In the court's view, though the parties differed in styles and approaches to life, they had been able to communicate and agree on the major issues concerning the child's upbringing. Indeed, according to the court, the parties had similar social and educational backgrounds, similar values, and similar aspirations for their daughter.

The majority does not dispute any of these findings or conclusions, but rather asserts that the court's order is unauthorized under § 665(a) because it cannot be characterized as awarding primary parental rights and responsibilities to Ellen. The majority acknowledges that the family court gave Ellen sole physical rights and responsibilities, and that, therefore, she is primarily responsible for the routine daily care and control of the child. Nevertheless, the majority minimizes this assignment of parental responsibilities and concludes that because Ellen can make no important decisions concerning the child without consulting and reaching agreement with Tom, parental rights and responsibilities were not awarded *primarily* to Ellen.

The majority's conclusion is unsound because it is based on a faulty premise. I submit that it is the day-to-day routine matters that connect a child with a parent and that offer the most opportunities for a parent to affect a child's growth and development. Undoubtedly, Ellen would be unwilling to trade places with Tom with respect to the court's determination of parental rights.

Under the statute, parental rights and responsibilities include both legal and physical responsibilities. See 15 V.S.A. § 664(1). Ellen was granted sole physical responsibility and shared legal responsibility for the child. Plainly, then, though the family court required consensus on major decision-making and gave Tom visitation rights, it awarded family parental rights and responsibilities *primarily* to Ellen. See Comment, *A Critical Look at Vermont's New Child Custody Law*, 11 Vt. L. Rev. 671, 675-76 (1986) (word "primarily" in § 665(a) implies that although one parent may have majority of rights and responsibilities, other parent will still share legal or physical rights and responsibilities).

The majority avoids this obvious fact by distorting the language of the governing statute. According to the majority, "where the parents

cannot agree, the court must award primary (or sole) parental rights and responsibilities to one parent." 166 Vt. at 493, 697 A.2d at 649. That is not how the Legislature wrote the statute, which provides: "When the parents cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." 15 V.S.A. § 665(a). Thus, the Legislature gave the court some discretion in determining what rights and responsibilities to assign to each parent.

The language of § 665(a), particularly the phrase "primarily or solely," represents a compromise between House conferees, who wanted to prohibit judges from granting joint custody absent the parties' agreement, and Senate conferees, who were unwilling to constrain judges in contested cases in such a manner. A. Davenport, A Legislative History of Act 181, 1986 Amendments to Vermont's Child-Custody Law, at 3 (1986). As Judge Davenport, then a state representative, pointed out:

> The compromise language in the final version reflects concessions on both sides. It allows a judge in a contested case to award rights and responsibilities "primarily or solely to one parent." The judge's ability is, however, tempered by 15 V.S.A. § 665(b)(8), which requires that parents be able to cooperate with each other when rights and responsibilities are divided or shared.

*Id.* Considering this history, the Legislature's use of the word "primarily" should be seen as giving family court judges some discretion to depart from the all-or-nothing approach adopted by the majority.

Further, as part of the same bill, the Legislature enacted a provision declaring and finding "that after parents have separated or dissolved their marriage it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents." 15 V.S.A. § 650. This provision undercuts the majority's conclusion that the family court's order violates not only the language of § 665(a) but also the policy behind the statute.[1] Indeed, §§ 650 and 665(a) resulted at least in part from

---

[1] The majority states that its reading of § 665(a) is reinforced by 15 V.S.A. § 666(b), which requires parents who have agreed to share or divide parental rights to include provisions in their agreement that address, among other things, procedures for communicating about the child's welfare and for resolving disputes. I agree that it might have been helpful for the family court to address these issues, but I do not agree

an effort to override this Court's adoption of a presumption against joint custody, see *Lumbra v. Lumbra*, 136 Vt. 529, 532, 394 A.2d 1139, 1142 (1978); A. Davenport, *supra*, at 1, and thus follow the national trend away from the common-law presumption against sharing parental rights and responsibilities.[2]

This trend has been fueled by research suggesting that the emotional trauma children and parents experience following divorce is exacerbated by parental conflict stemming from sole custody awards, under which one parent "wins" the right to exercise exclusive decision-making authority, while the other parent "loses" the right to remain an integral part of the child's life by having some say in the child's growth and development. H. Robinson, *Joint Custody: An Idea Whose Time Has Come*, 21 J. Fam. L. 641, 645 (1983). When parental rights and responsibilities are awarded solely to one parent, that parent assumes "a truly awesome power to shape and influence the child's image of, and attitude toward, the noncustodial parent." *Id.* at 647. This often results in the noncustodial parent withdrawing from contact with the child, which, in turn, can create in the child feelings of abandonment. Visitation rights alone cannot overcome these problems. A child's perception of a noncustodial parent is tainted when that parent lacks the ability to exercise any control or make any major decisions in the child's life.

The majority recognizes the family court's desire to preserve the child's relationship with her father, but states that an order imposing shared decision-making is inappropriate where the parents "have not evinced a willingness to work together." 166 Vt. at 494, 697 A.2d at 650. The concurrence readily agrees that divorced parents "must manifest an ability to cooperate and compromise over basic child-care decisions to warrant an award of joint rights and responsibilities." *Id.* at 504, 697 A.2d at 656. Both opinions ignore the family court's findings and conclusions, which are fully supported by the record, that the parties have similar backgrounds, values, interests, and aspirations for their daughter, and are able to communicate and cooperate over issues concerning her needs.

___
that § 666(b) evinces the Legislature's intent to bar family court judges from ordering shared responsibility (absent an agreement between the parties) with respect to any of the subject matters mentioned in that provision. Rather, § 666(b) is a checklist of important factors for parents and courts to consider in sharing and assigning parental rights and responsibilities.

[2] Currently pending before the Legislature is a bill that would amend § 665(a) by inserting a sentence stating: "[I]t shall be presumed that shared parental rights and responsibilities are in the best interest of the child." S. 124, 1997 Sess.

Here, we have two parents who want to preserve the close, loving relationship that each of them has had with their daughter. Ellen, however, has a history of abusing her authority over the child by attempting to alienate her from her father. To protect the father-daughter relationship and allow Tom to have some meaningful role in the child's life without uprooting her, the court allowed the child to remain with Ellen, her primary caregiver, but granted both Ellen and Tom shared parental authority to make the major decisions affecting their daughter's life. Under the facts and circumstances of this case, the order is reasonable. Further, because the order awards parental rights and responsibilities *primarily* to one parent, as explicitly permitted by § 665(a), it is within the family court's authority. I would affirm the order in its entirety.