*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-477

JUNE TERM, 2015

| | | |
|---|---|---|
| Megan Boyle | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Rutland Unit, |
| v. | } | Family Division |
| | } | |
| | } | |
| Kevin O'Neill | } | DOCKET NO. 442-10-10 Rddm |

Trial Judge: Nancy S. Corsones

In the above-entitled cause, the Clerk will enter:

Father appeals from the trial court's denial of his motion to modify parental rights and responsibilities. We affirm.

Parents married in July 1997, and, following protracted litigation, they divorced in September 2012. They have three minor children, ages thirteen, twelve, and seven. At the time of the divorce, the parties agreed, and the court found that it was in the children's best interests, that mother be the children's primary legal and physical custodian, subject to father's right of parent-child contact. Father is now remarried and has a child with his new wife; mother has been involved in a three-year relationship with her new partner. In July 2014, mother moved to modify parent-child contact as she planned to relocate to California with her partner. Father opposed the motion and moved to modify parental rights and responsibilities. Two weeks before the scheduled hearing, father sought a continuance to allow Dr. Joseph Hasazi, who had performed a forensic evaluation for the divorce, to provide an updated forensic evaluation. Wife opposed the motion. The court denied father's request, finding that Dr. Hasazi's assistance was not essential to hearing and determining the issues raised by the parties' motions.

Following a hearing, the trial court granted mother's motion to modify parent-child contact and denied father's motion to modify parental rights and responsibilities. It made the following findings. Pursuant to the final divorce order, father had contact with the children every other week from Thursday night to Monday morning, and every "off" Wednesday from 3:00 p.m. until 8:00 p.m. The parties were ordered to equally split the summer and school year vacations. Generally speaking, the parties had adhered to this schedule. While the parties continued to have conflicts with one another, the children had largely been isolated from these conflicts.

Mother transported the children to team practices and events, as well as medical appointments. Mother did all of the food and clothing shopping for the children. She was responsible for the children 16 out of the 20 school nights in the average school month. The

court noted that school-night responsibility for three busy children was qualitatively different than off-school-night and weekend responsibilities. The court found that the children's teachers had no qualms about either parent's ability to address their children's educational issues. The court found no credible, reliable evidence that created any hesitation in continuing to vest mother with the legal right to make educational decisions for the children.

Both parents involved the children in positive, pro-social, and family-oriented activities. The children adored their parents as well as their new half-brother, born to father and his new wife in January 2014. Father's new wife had also become an important figure in the girls' lives. The court found that separating the girls from their half-brother and stepmother was an important consideration in its analysis.

Mother and the children had recently moved into mother's partner's home. The children had a good relationship with mother's partner and with the partner's children. The partner had a job in California and had moved there by the time of the hearing. Mother wanted to move to California with the girls to join her partner. Both mother and her partner have family in California. Mother's sister has a successful interior-design business in San Francisco, and mother hoped to replicate her sister's success in Palm Springs. Mother also believed that she could build a property-management business similar to one that she built with father during the marriage. Mother had explored the available school systems in California. The children were seasoned travelers and had flown long distance for many years.

The court found that any fundamental change in caregiver status should be approached with caution. The evidence clearly showed that father remained very controlling and inflexible in his relationship with mother. He blamed mother for any scheduling mishap and he continued to browbeat mother in written and electronic communications. Mother, on the other hand, wanted to move forward and get beyond the angriness of the divorce. Nonetheless, the court found that both parents had acted in a petty and immature manner towards each other before, during, and after the divorce. The concern as it related to the children and the proposed change in primary caregiver was father's continuing practice of sending inflammatory and accusatory statements to mother and exaggerating routine scheduling conflicts into unnecessary opportunities for continued hostility, which was clearly not in the children's best interests.

The court explained that there had been testimony about the quality of the time the children would have with father if he was to become their primary caregiver. Between September and the end of the ski season, father was essentially on call around-the-clock, running Trailside Management Incorporated, an entity that takes care of and rents out properties for their owners. The court found that father's work habits had not changed since the divorce. He was a hard working person who was responsible for a demanding and successful business. The current schedule provided that father had the children overnight on school nights about thirty-six nights a year.

The court noted that it had heard the parties' divorce trial. The court had found there that mother was clearly the primary caregiver for the children and was a very "hands-on" parent. Mother had continued to be the hands-on parent after the divorce. Mother had attended to the children's needs. The children were healthy, well-fed, well-dressed, and their medical needs were being met. The court found it beyond question that since the divorce, mother had been the

primary parent to attend to the children's daily needs and that she had fully met this obligation in the best interests of the children.

Both parents attended the vast majority of the children's school and extracurricular events. Mother's move would make it impossible for this practice to continue, but the court found that this would be the result no matter how it decided the case as mother planned to move to California with or without the children. The court found insufficient evidence upon which to make a finding regarding how the absence of one parent at these events would impact the children.

Mother proposed that if she moved to California with the children, the court should award father visitation every school vacation and the bulk of summer vacation. She also proposed that father visit with the children whenever he could travel to California for up to seven consecutive days each visit. Thus, mother argued that the move to California would reduce father's scheduled time from the current 140 nights a year to a planned 125 nights a year, with the proviso for additional visits in California. Mother maintained that her proposal to move to California with the children did not constitute a real, substantial, and unanticipated change in circumstances. She argued that the move would really affect only the scheduling of the times the kids would be with father, as opposed to the content of their time together.

Father opposed mother's request. He argued that the move to California was a real, substantial, and unanticipated change in circumstances that warranted a change in the parental rights order. He maintained that his proposed modification of parental rights and responsibilities was in the children's best interests. The court found father's proposed parent-child contact schedule was notably less expansive in terms of contact versus mother's proposal. Mother currently had the girls 225 nights a year and father proposed that, should he be awarded primary custody, mother would have a minimum of fifty-three nights per year.

Father asserted that the move would obliterate what he viewed as a "co-parenting" relationship between himself and mother. The court found that the evidence did not show, even to the slightest degree, that parents had co-parented the girls since the divorce. It found that the parenting situation was more in the nature of "parallel parenting," with minimal direct interaction between parents. Parents did not make any joint decisions and there was no collaborative communication. In fact, there was evident hostility. At best, the court found, there was an uneasy truce that hadn't spilled over to outright hostility expressed face to face.

Based on these and other findings, the court turned to the legal issues before it. It explained that to modify an existing order regarding parental rights and responsibilities or parent-child contact, it must make a threshold finding that there has been a "real, substantial and unanticipated change of circumstances." 15 V.S.A. § 668(a). The burden of showing changed circumstances to alter parent-child contact is lower than the heavy burden for changing custody. Hawkes v. Spence, 2005 VT 57, ¶ 20, 178 Vt. 161. In the context of relocation cases particularly, when addressing a motion to modify parental rights and responsibilities, the change-in-circumstances analysis focuses "only" on the question of whether the relocation "significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan." Id. ¶ 13 (quotation omitted). The court recited other applicable legal standards as well.

The court concluded that should mother retain primary parental rights, the relocation to California would require modification of the current parent-child contact order. It did not find a change of circumstances, however, for purposes of changing custody. The court explained that mother had always been the primary parent, and she had always assumed and exercised a much greater degree of day-to-day custodial responsibility for the children than father. Mother had the children 62% of time, while father had them 38%. The majority of mother's time was during the school week with attendant extra responsibilities. The children had done well under mother's primary care. The court recognized that father loved the children and had provided them with an exceptional amount of financial and material support. Nonetheless, he had not been the primary parent or a co-parent. As previously stated, he was a parallel parent who helped the children with their homework, created fun outings for them, and cooked and cared for them during his time with them. Father also attended sporting and other extracurricular events and school-related meetings. The court concluded that the proposed relocation, in consideration of mother's proposed schedule for father, would not significantly impair the amount of custodial responsibility father had been exercising since the divorce.

The court found that the move was a permanent change and the parties would now live at opposite ends of the country. The children would be essentially a day's worth of travel away from the other parent. While electronic communication was not a substitute for face-to-face contact, it did provide a meaningful way to connect over a long distance. The fact that one parent would miss out on games and other moments with the children was unfortunate, but it was not controlling, as this would always be true in a relocation case.

The court found that the substantive legal question was whether revising visitation arrangements as requested by mother, and reducing father's minimum from 140 nights a year to 125 nights, would significantly impair rights that father had been exercising under the present schedule. The court concluded that his rights would not be significantly impaired.

Even if father had established a change of circumstances, the court concluded that it was not in the children's best interests to award primary custody to father. In reaching this conclusion, the court analyzed the statutory best-interests factors set forth in 15 V.S.A. § 665. It found that both parents loved the children and provided them with affection and guidance, but mother was the far more flexible parent. It was evident that the children had thrived under the current custodial arrangement. Each parent could assure that the children lived in a safe environment and received adequate food, clothing, medical care, and other material needs. They both provided well for the children. The court rejected father's contention that he had the greater ability to meet the children's needs because mother had not established a plan to secure her financial future. The court found that mother's financial prospects were brighter with a move, and that father paid very generous support. Mother was also without question able to meet the children's medical needs.

As to the remaining factors, the court found that both parents could meet the children's developmental needs, although, again, mother was the more flexible parent. Father's tendency to denigrate and demean mother had delayed the children's healing process following the divorce. The children were well-adjusted to their life in Vermont, but if they remained there after mother's move, they would face the significant change of the absence of their mother, who had been their primary parent since birth. The court expressed its strong concern that because father

4

had a more rigid approach to organizing the children's lives and schedules than mother did, the children would probably have a difficult time adapting to living full-time with father.

The evidence also overwhelmingly showed that mother was far more capable and had the vastly superior disposition to foster a positive relationship with father than the reverse. Both parents were extraordinary hostile to one another before and during their separation. Mother had been able to put the past behind her, however, while father continued to demean and denigrate mother. Father justified his communications as a warranted response to what he viewed as mother's irresponsibility and unwillingness to strictly adhere to a schedule. The court also noted that father's proposal for contact, should he be awarded primary custody, was charitably described as stingy. He proposed reducing mother's current 225 nights per year to fifty-six nights per year, which was a 75% reduction in her time, and 40% percent less than father currently enjoyed with the children. The court found that father's proposal spoke volumes about his ability and disposition to foster frequent and continuing time between the girls and their mother if he were to be awarded primary parental rights.

As indicated above, mother had always been the children's primary care provider. This was an important issue for the older girls and a critical one for the youngest child, who was in second grade. The court found no evidence that interfering with this bond would be best for the children. Finally, the court considered the children's relationships with others, including their stepmother and their half-brother. It also considered their relationship with relatives who would live in California. The court found the relationship between the children and their half-brother was very important and should be nurtured. Nonetheless, the relationship with their half-brother did not outweigh the importance of mother's primary caregiver status, nor did it outweigh the fact that father did not have the ability or disposition to foster a good relationship with mother if the girls were to live with him. The court applied this same analysis to the children's relationship with their stepmother. For these and other reasons, the court granted mother's motion to modify parent-child contact and it denied father's motion to modify parental rights and responsibilities. This appeal followed.

Father first asserts that the court erred in denying his motion to continue the hearing. Father argues that the court could have better assessed the children's best interests if it had the updated forensic evaluation. He points to the court's statement that it had insufficient evidence to determine the impact that the absence of one parent at the children's sporting events would have on the children. Father asserts that Dr. Hasazi could have provided such information had he conducted an updated forensic evaluation.

As father recognizes, the court has broad discretion in ruling on motions to continue and in determining pretrial motions regarding potential witnesses. "A decision to grant or deny a continuance is a discretionary matter and will not be disturbed unless there is shown an abuse of discretion which causes prejudice." Finkle v. Town of Rochester, 140 Vt. 287, 289 (1981); see also Kohut v. Kohut, 164 Vt. 40, 45 (1995) (holding that court did not abuse its discretion in denying motion to continue to obtain counsel). Father fails to show an abuse of discretion here. The court concluded that it did not need an updated forensic evaluation to rule on the parties' motion. That is borne out by its decision. The parties presented extensive evidence at the contested hearing, and the court had sufficient evidence on which to base its decision. The court's decision did not turn on the impact of one parent's presence or absence at the children's

sporting events. Its statement about the children's sporting events does not show that an updated forensic report was necessary or that father was prejudiced by the denial of his request for a continuance.

Father next argues that the court erred in finding that he did not demonstrate a change in circumstances. He emphasizes his close bond and active relationship with the children and the fact that he was available to the children when emergencies arose. He reiterates many of the court's factual findings. Father complains that the court focused too heavily on his relationship with mother, and his role as a "parallel parent," rather than focusing on the impact the relocation would have on the children, including to the relationships the children had with friends and family in Vermont.

We need not address these arguments, which essentially focus on the trial court's assessment of the weight of the evidence. Even assuming that the court erred in finding no change in circumstances, the trial court went on to conclude that modification of parental rights and responsibilities was not in the children's best interests. Thus, any error in the change-of-circumstances analysis is harmless.

We thus turn to father's challenge to the court's best-interests analysis. The trial court has "broad latitude in determining a child's best interests." Thompson v. Pafundi, 2010 VT 80, ¶ 11, 188 Vt. 605. We will uphold its findings unless they are clearly erroneous, and its decision will stand absent a showing that the court abused its discretion. Its findings will stand unless its "discretion is erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence." Myott v. Myott, 149 Vt. 573, 578 (1988) (quotation omitted).

Father argues that important court findings are not supported by the evidence. He questions why mother's partner did not testify at trial and asserts that there was no evidence to support the court's statement that mother's partner had already moved to California. Father also argues that the court should have found that he had greater ability than mother to provide for the children's financial needs and that the evidence does not support the court's finding that mother would have brighter financial prospects with the move. Father also takes issue with the court's conclusion that mother was far more capable and had the vastly superior disposition to foster a positive relationship with father than the reverse. He argues that the court should have placed more blame on mother for certain actions. Finally, father contends that the balancing test should have tipped in his favor because mother did not know where she would live and work in California, she did not know about childcare options, and she did not know where the children would attend school or what types of activities would be available for them.

We find these arguments without merit. First, mother testified that her partner had obtained a job in California. She stated that he had secured a three-month rental and was "waiting" for mother and the children. This evidence supports the court's statement that the partner was in California at the time of the hearing. As mother points out, moreover, if father wanted to secure the partner's presence at the hearing, he could have done so.

Father's remaining arguments go to the court's assessment of the weight of the evidence and the credibility of witnesses. We have repeatedly emphasized that it is for the trial court, as

6

the finder of fact, "to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." Cabot v. Cabot, 166 Vt. 485, 497 (1997). This Court does not reweigh the evidence or make findings of credibility de novo. Mullin v. Phelps, 162 Vt. 250, 261 (1994). As set forth above, the court rejected father's contention that he was better able to provide for the children's financial needs and explained why it did so. During her testimony, mother identified reasons why she believed her job prospects were better in California, and the court credited her testimony. The court also noted that father paid generous support. The court did not err in reaching its conclusion on this point.

The court's conclusion that mother is better suited than father to foster a positive relationship with the other parent is equally supported by the court's findings and by the record. The court provided numerous reasons why it reached this conclusion, set forth above and in much greater detail in the court's order. While father disagrees with the court's conclusion, he has not shown that it is error. This is also true of father's complaint that the court should have viewed mother's conduct in a more negative light. Father's final contention is simply another challenge to the court's assessment of the weight of the evidence. The court explained why it concluded that mother should retain primary custody, including the fact that she was the primary caregiver and she was better able to foster a positive relationship with the other parent. We will not reweigh the evidence on appeal. We find no error in the court's decision.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

7