## Paula Jakab v. Danny Jakab

[664 A.2d 261]

No. 94-348

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed June 23, 1995

---

576

*Jean Anne Kiewel* of *Kiewel & Harris, P.C.*, Brattleboro, for Plaintiff-Appellee.

*Richard H. Coutant* of *Salmon & Nostrand*, Bellows Falls, for Defendant-Appellant.

**Dooley, J.** Defendant Danny Jakab appeals the Windham Family Court's decision in the divorce action brought by plaintiff Paula Jakab. Defendant raises three arguments on appeal: (1) that the trial court erred by taking judicial notice of testimony given by one of the parties' children at a prior proceeding; (2) that the trial court violated defendant's religious freedom under the United States and Vermont Constitutions because it improperly based its visitation order on evidence relating to his religious beliefs; and (3) that the trial court improperly awarded the marital residence to plaintiff based on a request made after the evidence was closed. Although we reject defendant's arguments, we strike part of the visitation order because it violates 15 V.S.A. § 664(1). In all other respects, we affirm.

The parties were married in 1976 and separated in 1991. They have five children, the oldest of whom is plaintiff's by a previous marriage.

The trial court found that the marriage was marred by defendant's extreme outbursts of rage and cruelty, which were often targeted directly at the couple's children or plaintiff. In 1992, the trial court issued a temporary order that gave plaintiff full parental rights over the minor children, and strictly limited defendant's visitation with his children. In 1993, the Commissioner of Social and Rehabilitation Services (SRS) took custody of the children due to plaintiff's prolonged illness and reports of child abuse against defendant; the family court conducted a Child in Need of Care and Supervision (CHINS) merits hearing in April of 1993. By the final divorce hearing in December of 1993, all of the children except one had been returned to plaintiff's custody.[1]

## I.

Defendant first argues that the trial court erred by taking judicial notice of testimony given by one of the children at the CHINS merits hearing in April of 1993. The testimony given by the child concerned defendant's abusive methods of disciplining the children, and the trial court used much of this testimony to corroborate its findings on this point. Defendant argues that the determination of parental rights and responsibilities, the visitation order and the property distribution all rest on these findings, and must be reversed because of the alleged error.

Prior to the adoption of the Vermont Rules of Evidence we held that "[i]t is improper for a court to take judicial notice of the files, records and judgment in a case other than that on trial." *In re Estate of Leno*, 139 Vt. 554, 557, 433 A.2d 260, 262 (1981). *Leno* was based, in part, on the concern that "matters might be considered that a party has no opportunity to meet and explain." *Condosta v. Condosta*, 139 Vt. 545, 547, 431 A.2d 494, 495 (1981). Thus, *Condosta* suggested that judicial notice might be appropriate if the opposing party had an opportunity to respond. See *id.* at 547, 431 A.2d at 495-96. An opportunity to be heard on matters proposed for judicial notice is now built into V.R.E. 201(e). The broad statement of *Leno* goes too far in light of this procedural safeguard of the rule.

The use of judicial notice here, however, is of a different kind than that addressed in *Leno* or *Condosta*. The court took judicial

---

[1] All of the petitions were ultimately dismissed, but one of the children returned to SRS custody on a separate petition.

notice not only of the fact of the prior testimony, but also its content to use as evidence in the proceeding before it. Rule 201 permits judicial notice of adjudicative facts if "not subject to reasonable dispute" because "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." V.R.E. 201(b). The content of the testimony in the CHINS proceeding does not fit within the limits of the rule. See *In re Zemple*, 489 N.W.2d 818, 820 (Minn. Ct. App. 1992) (testimony in prior related proceeding "not properly the subject of judicial notice" because "not beyond dispute" and thus did not meet requirements of Minnesota Evidence Rule 201(b)). It is improper to judicially notice the content of testimony in another proceeding. See *id.*; *United States v. Sixty (60) Acres in Etowah County, Ala.*, 736 F. Supp. 1579, 1581 (N.D. Ala. 1990), *rev'd on other grounds*, 930 F.2d 857 (11th Cir. 1991); *Sutherland v. Sutherland*, 831 S.W.2d 283, 285 (Tenn. Ct. App. 1991); *May v. May*, 829 S.W.2d 373, 376 (Tex. Ct. App. 1992).

 Our rules present a clear, albeit limited, method of introducing testimony from a past proceeding into the proceeding before the court. The testimony of witnesses must normally "be taken orally in open court." V.R.C.P. 43(a); V.R.F.P. 4(g)(1) (governing divorce proceedings). We allow former testimony of a witness to be admitted, however, when the witness is unavailable and the testimony meets the requirement of a hearsay exception, as follows:

> (1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

V.R.E. 804(b)(1). There is no indication here that the child witness was unavailable to allow admission of her former testimony under the hearsay exception. In any event, the fact that the former testimony "would be easily admissible under the hearsay exception . . . does not render [it] subject to judicial notice under V.R.E. 201." *Leuders v. Leuders*, 152 Vt. 171, 173, 566 A.2d 404, 405-06 (1989).

 The fact that it was improper to take judicial notice of the former testimony does not end our inquiry, however. The consider-

ation of the former testimony is error only if "a substantial right of the party is affected." V.R.E. 103(a). Thus, we will not reverse if the error is harmless. See *State v. Veach*, 157 Vt. 473, 475, 599 A.2d 1374, 1375 (1991). Put another way, the rule requires that the appealing party demonstrate "prejudice" from the erroneous ruling. See *Keus v. Brooks Drug, Inc.*, 163 Vt. 1, 7, 652 A.2d 475, 480 (1994).

■ We recognize, as defendant stresses, that the trial court's findings were explicitly based upon "judicially noticed material" along with the evidence, that a few of the many findings came from the CHINS testimony, and that defendant denied the allegations of physical abuse. We conclude, however, that the evidence supporting the allegations of physical abuse of the children by excessive discipline was overwhelming so that the use of the CHINS testimony was harmless. Both plaintiff and her daughter from an earlier marriage testified at length, and in detail, to defendant's acts of abuse. An evaluation of the family was done by a psychiatrist who is the medical director of the Brattleboro Retreat. After the evaluation, the psychiatrist reported the case to SRS because he concluded that the children were at risk of physical abuse from defendant and that it would be dangerous to allow the children to reside with defendant. His opinion was based in part on a meeting with the children where:

> They spoke of explicit events where they felt as though they'd been physically abused. [One child] . . . spoke of having a coffee can thrown at her back. [Another] . . . said a rock was thrown at her. They spoke of being hit with the hand, the strap, the belt, and a paddle. They were being spanked in the face.

It was also based on the fact that defendant admitted to him the conduct which the children characterized as physical abuse.

A social worker for SRS also testified about the family situation. She had a lengthy conversation with defendant about appropriate discipline, stating that SRS policy permitted spanking if done "with an open hand on clothed buttocks." She noted that in response to this policy defendant expressed frustration. Defendant questioned how children could be adequately controlled, and stated that children need more discipline. SRS continued to maintain an open case on the family to protect the children.

In light of all the evidence, the trial court found that "[d]efendant incredibly minimizes his over-discipline of the children." The court concluded that defendant was physically abusive to the children and

to plaintiff. We can say with sufficient certainty that the conclusion would have been the same even if the CHINS testimony had not been considered. Consideration of this testimony was harmless.

## II.

Defendant next argues that the trial court violated his free exercise of religion as protected by the United States and Vermont Constitutions by restricting his visitation rights. The visitation order to which defendant objects provides visitation with his two sons for only seven hours every other week and then only if supervised by a person approved by the guardian ad litem and the attorney for the children. It encourages, but does not require, that the youngest daughter join in this visitation. Visitation for the other daughter, who is seventeen years of age and in SRS custody, is to be determined by her legal guardian and custodian. The order provides that defendant "may obtain expanded visitation with one or all of the children upon a demonstration before this Court that he has remediated his beliefs and attitudes that led to child abuse in the past." It further provides that "the children shall not be compelled to attend religious services against their will." Defendant argues that the restrictions were imposed in response to religiously motivated actions and beliefs.

We note at the outset that defendant's claim here is not the same as that made before the trial court. In the trial court, when defendant's step-daughter testified to the influence of the Jehovah's Witnesses faith on her and plaintiff and how plaintiff reached the decision to leave the church, defendant objected that religious beliefs were not proper for consideration. In this Court, defendant argues that the trial court infringed on the free exercise of his religion, a claim that is maintainable only if there is evidence of the nature of his religious belief and how his free exercise of religion is burdened by the action of the court. See *State v. DeLaBruere*, 154 Vt. 237, 249, 577 A.2d 254, 261 (1990) (noting that one element of a First Amendment violation claim is that exercise of religion is burdened by challenged government action). Even with respect to constitutional claims, we ordinarily require that the issue on appeal be raised below. See *Varnum v. Varnum*, 155 Vt. 376, 382-83, 586 A.2d 1107, 1110-11 (1990).

Defendant's position at trial makes his claim far less tenable here. Apart from the religion claim, he has not argued that the visitation restrictions were inappropriate given the court's findings that he physically abused the children by excessive discipline over an ex-

tended period of time.[2] Thus, he could attempt to justify his actions only by injecting religion into the case. Instead, he tried to keep religion out.

Not surprisingly, defendant's position has resulted in an inadequate record to consider his challenge here. Although the step-daughter testified that Jehovah's Witnesses believe in the maxim "Spare the rod and spoil the child" and the psychiatrist testified that defendant believed in this policy, there was no showing of the nature of defendant's religious belief and whether it motivated the physical abuse which the trial court found. The only relevant evidence is defendant's statement that he believed in corporal punishment "[b]ased on my principles that I was brought up, and based on the scripture backing, that discipline is something . . . that the Creator expects parents to do." Because of the mixing of lessons from defendant's upbringing with "scripture backing" and the use of the vague term "discipline," this statement falls far short of a claim that defendant's actions were motivated "by a sincerely held religious belief" or that curtailment of such physical abuse would burden defendant's free exercise of religion. See *DeLaBruere*, 154 Vt. at 249, 577 A.2d at 261 (stating elements of free exercise of religion claim). Of course, it was difficult for defendant to make a record for a free exercise claim when he denied engaging in the physical abuse that motivated the visitation restrictions.

The inadequate record puts this case in a posture similar to that in *Varnum*, where the free exercise claim was not raised below and the mother, who was a Jehovah's Witness and had been denied custody in the trial court, argued that interference with her religious freedom violated her constitutional rights. We noted the inadequate record in *Varnum* and found "there is no specificity on the exact nature of her religious belief and the extent to which it commands the practices." *Varnum*, 155 Vt. at 386-87, 586 A.2d at 1113. In *Varnum* the record established "that physical discipline is associated with the child-

---

[2] Although we do not read defendant's argument as challenging the visitation restrictions apart from his religious freedom claim, we have considered the propriety of the visitation order. The family court has the discretion to limit visitation where it finds it to be in the best interest of the children. See *Bissonette v. Gambrel*, 152 Vt. 67, 69-70, 564 A.2d 600, 601 (1989). The findings support the court's order. The children were fearful of defendant and reluctant to visit with him. Defendant has physically abused the children but is in denial about it. He expresses frustration about limitations on his ability to discipline them. The visitation order balanced the need for the children to have an ongoing relationship with defendant against their safety. The court indicated that it was prepared to modify the order if defendant confronted his physical abuse of the children and changed his approach to discipline.

rearing practices of a Jehovah's Witness" but did not show that religious beliefs required the mother to hit the children "with instruments like the butter paddle and spoon," which the evidence showed had been used. *Id.* at 387, 586 A.2d at 1113. The record here does not establish a clear relationship between the religious faith of a Jehovah's Witness and physical discipline of children, nor does it show that defendant's religious beliefs required him to hit his children with a paddle, a fireplace poker or a strap, as the court found he did.[3]

■■ Even if we could review defendant's claim, the court's findings support its order. As *Varnum* states, religious practices may be considered in custody and visitation decisions if they "have a direct and immediate negative impact on the physical and mental health of the child." *Id.* at 384, 586 A.2d at 1111. The evidence supported, and the court found, such direct and immediate negative impacts. The psychiatrist's opinion, and the resulting SRS intervention, are particularly strong support for this conclusion.

Nor are we persuaded by defendant's argument that the family court sought to punish him for his religious beliefs by ordering that he change them before obtaining greater visitation. We read the court's conclusions as referring to defendant's disciplinary beliefs, not his religious beliefs. Nothing in the court's decision otherwise refers to defendant's religious beliefs.

■■ One other point requires some attention. In passing, defendant complains about the provision of the order that prohibits the parties from requiring the children "to attend religious services against their will" as evidence of the court's hostility to his religious beliefs. Although we do not agree with defendant's claim, we are troubled by the order because the trial court awarded plaintiff sole physical and legal responsibility of the children. Legal responsibility includes the right to "determine and control various matters affecting a child's welfare and upbringing, [including] . . . religion." 15 V.S.A. § 664(1)(A). Nothing in the statute suggests that children may determine their religious upbringing; this is a decision that belongs to the custodial parent. See, e.g., *Dunlap v. Dunlap*, 475 N.E.2d 723, 726 (Ind. Ct. App. 1985) (custodial parent's failure to take child to church

---

[3] Defendant acknowledges in his brief that if he committed "the acts of abuse described in the court's findings, these actions were not based on [his] religious beliefs." The court's visitation order is based on its findings, and those findings are fully supported by the evidence. Essentially, defendant admits that his religious beliefs have nothing to do with the court's visitation order.

not grounds for change of custody because statute leaves choice of religious training to custodial parent); *Wilhelm v. Wilhelm*, 504 S.W.2d 699, 700-01 (Ky. Ct. App. 1973) (visitation order permitting noncustodial parent right to enroll children in religious school violated statute that granted custodial parent right to determine children's religious training).

Plaintiff has defended the provision of the order as necessary to prevent proseltyzing of the children by defendant. We note, however, that the order limits plaintiff's rights, as well as those of defendant. Indeed, the restriction on defendant is more symbolic than real because of the limited visitation available to him. If a point arrives in the future where plaintiff's right to determine the religious upbringing of the children is violated by defendant's actions, plaintiff may seek appropriate relief. At this time, we believe the children's veto on their religious upbringing is inappropriate, and we shall strike that part of the family court's order.

### III.

Finally, defendant argues that the trial court's award of the marital home to plaintiff, exclusive of any interest of defendant, was erroneous. His primary complaint is that he received no notice that plaintiff was seeking the house outright until after the evidence was closed and he had no opportunity to respond. He argues that plaintiff's testimony at the hearing supported division of the equity of the home rather than an outright award to plaintiff.

In *Lalumiere v. Lalumiere*, 149 Vt. 469, 472, 544 A.2d 1170, 1172 (1988), we held that it was error to award maintenance where it had not been requested at any point prior to the order. See also *Nichols v. Nichols*, 133 Vt. 370, 371, 340 A.2d 73, 74 (1975) (same). The concern in *Lalumiere* was that the opposing party "was given no notice or opportunity to be heard on the issue." 149 Vt. at 472, 544 A.2d at 1172; see *Brown v. Brown*, 154 Vt. 625, 629, 580 A.2d 975, 978 (1990) (party entitled "to reasonable notice of what was in issue").

This case is different from *Lalumiere*. Plaintiff sought an appropriate property disposition in her divorce complaint. See *Nevitt v. Nevitt*, 155 Vt. 391, 398, 584 A.2d 1134, 1138 (1990) (*Lalumiere* distinguished where plaintiff sought "other relief as may be appropriate" in divorce complaint). Following plaintiff's testimony, her counsel stated, "I . . . ask the Court for permission to submit plaintiff's requests in writing as opposed to having her testifying

about it." Defendant indicated no objection, and the court granted the request. The written requests were submitted on time and included the request for the home. In the two and one-half months following submission of the requests, defendant never objected to the request for the award of the home or sought to put on new evidence. Defendant had fair notice of the procedure and the request. We find no error because the request for the home came after the evidentiary hearing.

Vermont's property distribution statute requires the court to equitably divide and assign the property and sets out twelve factors that the court may consider. 15 V.S.A. § 751. The trial court has wide discretion in considering these factors, and its decision will be upheld unless its discretion was abused, withheld, or exercised on clearly untenable grounds. See *Semprebon v. Semprebon*, 157 Vt. 209, 215, 596 A.2d 361, 364 (1991). The court need not specify the weight given to each factor, but is required only to provide a clear statement as to what was decided and why. *Id*. The court's decision in this case meets that standard.

The court noted and evaluated each of the statutory factors set out in § 751. It observed the inconsistency between plaintiff's testimony and her requested findings, but determined that, given the "extremely substantial" fault of defendant and the needs of the children, the marital home was to be awarded to plaintiff free and clear of defendant's interest. Sufficient findings exist to support these conclusions, see *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995), and we cannot conclude that the award amounted to an abuse of discretion. See *Lalumiere*, 149 Vt. at 471, 544 A.2d at 1172 (upholding 70%-30% property division).

*Paragraph #18 of the final order, which states that the children will not be compelled to attend defendant's religious services against their will, is stricken. In all other respects, the decision is affirmed.*