2004 VT 83

**Donna Rae JENIKE v. Ian JENIKE**

[857 A.2d 798]

No. 02-499

¶ 1. August 3, 2004. In this divorce action, husband appeals the Windsor Family Court's decisions on property and spousal maintenance. We reverse and remand because the court impermissibly based the maintenance award on husband's emotional abuse of wife and erred in its consideration of husband's depletion of marital property.

¶ 2. The parties were married for fifteen years and had no children together. At the time of the final divorce hearing in 2002, wife was fifty-four years old and husband was fifty-six years old. Both parties hold college degrees. Husband is an engineer and works for the Vermont Department of Transportation. Wife works at Dartmouth Hitchcock Medical Center as a laboratory service technician. Husband's annual employment salary is slightly higher than wife's.

¶ 3. During their marriage, the parties enjoyed a comfortable lifestyle, taking trips, eating frequently in excellent restaurants, and purchasing entertainment and sporting equipment, including a boat and vehicles. Although husband had substantial investments and received an annual cash gift from his parents of $20,000, wife paid for most of the couple's living expenses. Husband invested most of his income and the annual gift from his parents in the stock market. He imposed what the trial court described as "financial tyranny" on wife, acting unilaterally in trading stock and hiding financial investments and stock performance from her.

¶ 4. One of husband's investment accounts with Fidelity Investments was the

subject of some controversy in the parties' litigation. The account was worth $395,000 on December 31, 1999, a little over one week before wife filed for divorce. Within ten days after wife filed her divorce complaint, husband withdrew $145,000 from the Fidelity account which he used to pay his federal and state income taxes and to pay off the mortgage on his home. Wife neither consented to the withdrawals nor received any proceeds from them. The court found that husband further depleted the Fidelity account while this action was pending by continuing to buy and sell stock during a declining market. At the time of the final hearing, the investment account's value was $15,000. The court found that husband's withdrawals and continued manipulation of the investment account violated the court's interim order prohibiting the parties from concealing, damaging, dissipating, selling, assigning, or otherwise transferring any marital property "except by agreement or to meet the customary demands of everyday life or to conduct business in the ordinary course."* Because of husband's unilateral actions, the court determined that the account's value for property distribution purposes was $260,000.

¶ 5. Wife had little, if any, retirement savings before she married husband, but was able to accumulate approximately $177,979 in retirement savings during the parties' marriage. Wife owns a home and a land-locked lot in Springfield, Vermont

---

* The interim order read as follows: Neither party shall conceal or damage any marital property, real or personal. Neither party shall dissipate, sell, remove, assign, transfer, dispose of, lend, mortgage or encumber marital property, real or personal, except by agreement or to meet the customary demands of everyday life or to conduct business in the ordinary course.

that she and her brother inherited from their mother. The value of wife's interests in both properties is roughly $81,500.

¶ 6. In addition to evidence on the parties' assets, the court heard evidence on husband's mistreatment of wife. The court found that husband treated wife with progressive disdain and contempt, threatened her life, and committed adultery. Husband's search for female companionship other than his wife's was detailed in the court's order and need not be repeated here. The court found, however, that husband engaged in an "ongoing callous plot" designed to "inflict as much emotional pain as he possibly could on a devoted, forgiving wife." After wife filed for divorce, husband frequently left threatening messages on wife's answering machine. The court heard some of the recorded messages during trial and commented in its final order that the messages were profane, degrading, and evidenced a "man who was totally out of control and terminally afflicted by the 'Midas Touch.'" Because of husband's abuse and threats to use lethal force against wife, the court's final order made permanent a relief-from-abuse order it had entered in July 2001.

¶ 7. The court ultimately found that husband was responsible for the failure of the parties' marriage, and concluded that the wife was entitled to more than half of the combined marital assets. It divided the property and ordered husband to pay wife a sum of $100,000 as part of the settlement. In addition, the court concluded that:

> because of [husband's] emotional abuse to [wife], ... not only does he pay part of her attorneys fees, but it is also reasonable that he pay to [wife] spousal maintenance in the amount of $300 per month for a period of 15 years .... The parties established an excellent

standard of living during the marriage, and it was only brought to an end because of defendant's conduct.

After the court denied husband's post-judgment motion for reconsideration, husband took the present appeal.

¶ 8. Husband first attacks the maintenance award. He claims that the court awarded maintenance to punish him for his mistreatment of wife while they were married. Husband argues that fault and punishment are not factors the court may consider when deciding whether to award maintenance. On appeal, the party claiming error in a property and maintenance award must show that no reasonable basis exists to support the award. *Bell v. Bell*, 162 Vt. 192, 197-98, 643 A.2d 846, 850 (1994). Husband has made that showing here because the grounds for the court's award are not found in 15 V.S.A. § 752, the statute authorizing maintenance in divorce proceedings.

¶ 9. Under § 752(a), the family court has discretion to award maintenance if it finds that the spouse seeking it lacks adequate income or property to provide for his or her reasonable needs, and the spouse cannot support himself or herself at the standard of living enjoyed during marriage. 15 V.S.A. § 752(a); see also *Delozier v. Delozier*, 161 Vt. 377, 381, 640 A.2d 55, 57 (1994) (family court has broad discretion in determining maintenance award). The purpose of maintenance is "to correct the vast inequality of income resulting from ... divorce." *Strauss v. Strauss*, 160 Vt. 335, 338, 628 A.2d 552, 554 (1993). Thus, § 752's plain language focuses on the parties' financial resources, needs, and their relative abilities to become or remain self-supporting following divorce. See 15 V.S.A. § 752(b) (when fashioning maintenance award, the court may take into account such factors as the time and expense necessary for the recipient spouse to obtain education or training to be employable, the duration of the marriage, the parties' ages and health, and the standard of living established during the marriage). The statute contains no language suggesting that fault or punishment are valid considerations for awarding maintenance.

¶ 10. The absence of fault as a criterion for ordering maintenance is in direct contrast to the language governing property distribution in divorce proceedings. Under 15 V.S.A. § 751, the court may consider the parties' respective merits — or fault — when establishing the equitable property division the statute contemplates. 15 V.S.A. § 751(b)(12); *Lewis v. Lewis*, 149 Vt. 19, 24, 538 A.2d 170, 173 (1987). Wife contends that the court's award in this case should stand because the questions of property distribution and maintenance are so intertwined that once fault is alleged and proved under § 751, there is no way for the court not to consider fault in crafting a maintenance award. Our prior cases have noted the necessary connection between §§ 751 and 752. See, e.g., *Downs v. Downs*, 154 Vt. 161, 168, 574 A.2d 156, 159 (1990) (noting that property and maintenance decisions are so closely related that both matters must be reconsidered on remand); *DeGrace v. DeGrace*, 147 Vt. 466, 470, 520 A.2d 987, 990 (1986) (same). That connection arises from the language of § 752(a), which requires the family court to consider the property awarded under § 751 when determining whether the spouse seeking maintenance has sufficient property or income to meet his or her reasonable needs following divorce. 15 V.S.A. § 752(a)(1). The statute thus contemplates that the family court will devise an equitable property settlement, taking into account the factors under § 751, including fault, before it considers whether the financial circumstances of the parties justify an award of maintenance. So while we agree with wife that property and maintenance issues are

related, the considerations justifying a property settlement are different from those grounding maintenance awards, and they must not be confused in the final analysis.

¶ 11. Wife also argues that the maintenance award is affirmable because the family court found that she could not maintain her predivorce living standard without maintenance. While wife's argument has some appeal, ultimately we must reject it. The court's order here explicitly grounded the maintenance decision on an impermissible factor, husband's bad conduct. We cannot tell from either the order or the record how much of the $300 per month payment the court ordered was meant to remedy husband's fault and how much was intended to ameliorate the financial disparity between the parties following the divorce. The court must consider wife's request for maintenance anew without taking into account husband's fault for ending the marriage.

¶ 12. Husband next claims that the court erred by valuing his Fidelity Investments account at $260,000 and that the court unjustly overvalued the account to remedy what it perceived as his violation of the interim order. The court has wide discretion in assigning value to marital property and dividing it equitably. *Jakab v. Jakab*, 163 Vt. 575, 585, 664 A.2d 261, 267 (1995). We will not disturb the award absent an abuse of the court's discretion. *Id.* The trial court assigned husband's Fidelity account a value of $260,000 based on (1) its conclusion that husband unilaterally withdrew approximately $210,000 from the account without wife's consent while the divorce was pending, which benefitted him alone, and (2) husband's continued manipulation of the account's investments in violation of the court's order, thus further reducing its value.

¶ 13. As noted, a court may consider the parties' respective merits — or fault

— when establishing the equitable property division the statute contemplates. 15 V.S.A. § 751(b)(12). While we agree with the court that husband violated the order by withdrawing money from the Fidelity account for his own purposes, we find the court erred in concluding that his continued trading of stocks was also a violation. The court wrote: "[a]rguably, the defendant was conducting business as usual. But in a declining market he was depleting assets in the marital estate without the consent of the plaintiff or permission of the court." The import of the wording is clear. Trading stocks may have been "business as usual," but doing so in a declining market was a violation of the order to the extent of any lost value. That meaning was reinforced by the court's ruling on defendant's motion to alter or amend with respect to the Fidelity account:

> He fails to appreciate the fact that the Court found the value of his account was $260,000.00, and the fact that he had withdrawn funds down to $15,000.00 at the time of the hearing was simply one of his unilateral violations of the Interim Domestic Order.

¶ 14. The evidence indicated that husband had put two hours per night into stock trading, and this activity had become a business for him. When served with the interim order, husband had choices: continue to hold exactly the portfolio he held on that date without further management, convert all the stock to cash and keep it in the account or transfer it to another account, and continue to buy and sell stocks to maximize value. The court held that the third choice — the one husband pursued — was a contemptuous violation of the order, and husband is responsible for any losses that occurred from it. Presumably, exercise of the second choice would be a violation for

the same reason — husband would have "disposed of" stock — although husband's risk would be different. The risk is that he would be faulted for not continuing the same conduct that had earned $151,000 in 1999 if the bull market continued in 2000. The only choice that does not violate the order, under the court's theory, is the first, but that choice is likely to be financial suicide in either a bull or bear market.

¶ 15. Of course, he could also have petitioned the court for permission to continue to manage the investment account, to clarify what the court considered "business as usual." This he did not do.

¶ 16. The evidence supports husband's claim that his management of the investment account was, for him, "business in the ordinary course" and not prohibited by the general language of the interim domestic relations order. In reaching this conclusion, we follow the decisions of the New York courts, which have specifically addressed this issue beginning with the leading case of *Richter v. Richter*, 515 N.Y.S.2d 876, 878 (App. Div. 1987). In *Richter*, the husband appealed a blanket injunction that the lower court held would prohibit him from continuing trading in his brokerage accounts while the divorce was pending. The Appellate Division reversed, reasoning:

> We find, however, that Special Term's imposition of a blanket preliminary injunction . . . is unduly restrictive insofar as it applies to the trading of securities held by the defendant and requires clarification. Since the brokerage accounts maintained by the defendant are speculative and volatile investments, such a restriction upon the transfer of securities may ultimately harm, rather than preserve, [the] asset . . . . There-

fore, the injunction granted by Special Term should be modified so as to permit the defendant to transact business within the accounts, provided that the cash or proceeds of the transactions are retained therein and are available upon the equitable distribution of the property.

*Id.*

¶ 17. By deciding that the court improperly assigned violation of the interim order as a grounds for determining property distribution, we are not suggesting that the court could not reach the same result on a proper rationale. Indeed, husband withdrew large amounts of cash from the Fidelity account for personal purposes, and these amounts alone could justify the court's property distribution. Further, the court can review the investment decisions made and determine if they were reasonable or if they were done for purposes that would not support a finding of prudent management, that is, to deliberately deplete the marital property. However, the rationale employed by the family court, if allowed to stand, could interfere with appropriate investment decisions and reduce the assets available to the divorcing parties for no good reason and by a boilerplate standard order.

¶ 18. Husband's last claim on appeal centers on the $100,000 payment he must make to wife as part of the property settlement. We do not reach this issue because the court may reconsider the payment on remand when it reconsiders the maintenance award. See *Semprebon v. Semprebon*, 157 Vt. 209, 216, 596 A.2d 361, 365 (1991) (remand for consideration of maintenance requires reopening property award).

*The decision on maintenance is reversed and the valuation of husband's Fidelity account is reversed. We vacate the property award and remand the*

*matter for further proceedings consistent with the views expressed herein.*