2012 VT 16

## Robert Molleur v. Susan Molleur

[44 A.3d 763]

No. 11-042

Present: Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Kupersmith, Supr. J., Specially Assigned

Opinion Filed March 9, 2012 ·

*Kerry B. DeWolfe* of *Rubin, Kidney, Myer & DeWolfe,* Barre, for Plaintiff-Appellant.

*Norman R. Blais* and *Suzanne R. Brown*, Burlington, for Defendant-Appellee.

¶ 1. **Dooley, J.** Husband appeals the property and maintenance components of a divorce order issued by the family division of the superior court. We affirm in all respects, except that we remand the matter for the court to amend the maintenance award's automatic inflation-adjustment provision.

¶ 2. Husband and wife, who were forty-three and forty-one years of age, respectively, when the final divorce order was issued, were married in August 1989 and separated in July 2008. They had two children, now both independent adults, the youngest having graduated from high school in 2008, shortly before the parties separated. During the marriage, the parties lived rent-free in a home owned by husband's father. At the time of the parties' divorce, the only significant marital asset was husband's military pension.

¶ 3. When the parties were first married, husband worked as an Army National Guard recruiter. He left active duty in 1994 but stayed in the reserves while he worked full-time for his father's business. In 2001, he entered active duty again and deployed to Iraq. Husband remained in the Army following his deployment and is eligible for full-time retirement at age forty-five in March 2013, at which time he would be entitled to 50% of the average of his last three years of base pay. Given husband's recent base-pay salary between $78,000 and $83,000, which does not include a substantial housing subsidy and other significant benefits, the court estimated that, assuming husband retired as expected in 2013, he would earn around $41,595 annually, or $3466 monthly, before taxes.

¶ 4. Wife stayed at home for much of the marriage but at times worked in minimum-wage jobs, often on a part-time basis. Over the years, she struggled with alcohol and mental-health issues, at one point having to be hospitalized for depression. At the time of the final divorce hearing, she was netting approximately $1040 a month after taxes while working thirty-two hours per week at a grocery store.

¶ 5. Following an evidentiary hearing, the trial court granted the parties a divorce and awarded wife: (1) as her share of the marital property, 75% of the marital component of husband's pension — which generates approximately $1444 per month or

roughly 41.67% of husband's total monthly pension payment; (2) maintenance in the amount of $1900 to $2100 per month for years 2011 to 2013 and $500 per month permanently thereafter, subject to an inflation adjustment; and (3) $2500 in attorney's fees. Husband appeals, arguing that the court abused its discretion by awarding wife 75% of the marital component of the pension and permanent maintenance. Husband also argues that the court erred by ordering an automatic adjustment of maintenance for inflation based upon an arbitrary formula that did not take into account his income.

■ ¶ 6. Before we turn to the specific points husband raises on appeal, a general observation is in order. Husband has made separate arguments about the provisions of the family court order dealing with the division of marital property and the award of maintenance. Although we are mindful that normally "considerations justifying a property settlement are different from those grounding maintenance awards, and they must not be confused in the final analysis," *Jenike v. Jenike*, 2004 VT 83, ¶ 10, 177 Vt. 502, 857 A.2d 798 (mem.), this case represents at least a partial exception to that general rule. Here, the only property at issue is husband's military pension, which provides an income stream after retirement. For that reason, its primary purpose is the same as an award of maintenance. "Pension income is therefore 'always an important factor in determining whether alimony should be paid and how much either spouse should receive.'" *Mayville v. Mayville*, 2010 VT 94, ¶ 11, 189 Vt. 1, 12 A.3d 500 (quoting G. Blumberg, *Marital Property Treatment of Pensions, Disability Pay, Workers' Compensation, and Other Wage Substitutes: An Insurance, or Replacement, Analysis*, 33 UCLA L. Rev. 1250, 1264 n.60 (1986)). Our property award statute allows consideration of whether the property award is "in lieu of or in addition to maintenance." 15 V.S.A. § 751(b)(7). Our maintenance award statute allows an award of maintenance if the recipient spouse "lacks sufficient income, property, or both, including property apportioned in accordance with section 751 of this title, to provide for his or her reasonable needs" and, in determining the amount and duration of maintenance, authorizes consideration of "the property apportioned to the party." *Id.* § 752(a)(1), (b)(1).

■ ¶ 7. In this case, the court made a combined property and maintenance award that provided wife with an income stream of

essentially the same amount per month from the date of the divorce and indefinitely thereafter. The court did this by providing the full monthly amount through maintenance until the anticipated date of husband's retirement and thereafter through retirement pension income supplemented by a small amount of maintenance. Although we have analyzed elements of the awards in response to husband's arguments, we conclude that we should view the awards as a package rather than focusing exclusively on the components as husband argues.[1]

¶ 8. Turning first to the court's property award, husband argues that the court abused its discretion by awarding 75% of the marital estate based solely on the disparity in the parties' financial circumstances, to the exclusion of other relevant factors, particularly the parties' respective contributions to the marriage and the parties' respective merits, both of which heavily favored him. In making this argument, husband particularly challenges the court's finding that wife's role as a homemaker was a mutual decision.

¶ 9. Both sides agree that, although she had brief periods of outside employment, wife's contribution to the marriage was mainly as a homemaker. The testimony was disputed, however, with regards to the significance of her contributions in this role. Husband testified that he and wife shared domestic duties for the first few years, but that, as her emotional problems became worse, he took on more of that role. Wife, however, testified that while husband worked or was away on recruiting assignments or being deployed, she was at home caring for the children. She stated that she did the cleaning, cooking, and shopping for husband and the children. In the end, the court determined that wife's " 'non-monetary contribution . . . as a homemaker' was questionable." (quoting 15 V.S.A. § 751(b)(11)). In contrast, the court recognized that husband had been the primary source of the family's income during the marriage and that he had carried much of the weight and responsibility to keep the family intact and functioning until the children reached adulthood. For these reasons, the court explicitly concluded that the respective contributions of the parties fell on husband's "side of the ledger."

---

[1] Although plaintiff objects to both the property award and the maintenance award, his general position is that wife should receive no income from him. He makes no argument that the mix between the property award and the maintenance award is inappropriate.

¶ 10. Husband nevertheless argues that the court erred in finding the wife's role as homemaker to have been the result of a mutual decision by the parties. Strictly speaking, this is not a dispute about wife's relative contribution to the marriage under § 751(b)(11). As already discussed, wife's contribution was as a homemaker — whether this was a mutual or unilateral decision — and the court found her contribution to be less substantial than husband's. Instead, the dispute goes to whether wife's failure to contribute was attributable to her alone or to both parties. This is a question of the respective merits of the parties under § 751(b)(12). Husband's argument is not only that wife did not, in her role as homemaker, contribute as much as he did, but also that her ineffective role was ultimately her fault.

¶ 11. The court, however, concluded that joint decisions or inaction led to wife's lack of outside employment. The court acknowledged husband's testimony that he wanted wife to work during the marriage. Nevertheless, the court found that it was more likely than not that wife's lack of employment during the marriage "was essentially a mutual choice, by default and inaction as much as any positive decision." While recognizing that wife did not fit the homemaker role well, the court found that "it was essentially the parties' choice (by attrition, if not positive decision) that [wife] would for the most part be a 'stay-at-home mom' when the children were younger." These findings represent a judgment that husband at least tacitly accepted wife's role and cannot now use it to obtain a greater share of the marital property.

¶ 12. Upon review of the record, we conclude that the court's findings on this point have support in the record. See *Solsaa v. Solsaa*, 2008 VT 138, ¶ 6, 185 Vt. 587, 969 A.2d 116 (mem.) (noting that trial court findings are viewed in light most favorable to prevailing party, disregarding modifying evidence, and will be upheld unless they are clearly erroneous). Husband testified that he and wife discussed on several occasions "the advantages to her staying home with the children, as well as the advantages of her working to improve our financial situation." He stated that he "strongly supported . . . any efforts by her to . . . seek employment," but that she was "[o]pposed to it." When asked on cross-examination whether husband encouraged her to work, wife stated, "I guess you could say that." She elaborated, however, that husband supported her decision and left it up to her to decide what to do. Given this testimony and the evidence con-

cerning wife's emotional problems, the court's findings on this point were not clearly erroneous. Although the record suggests that husband on some occasions encouraged wife to work outside the home, this hardly precludes the trial court's conclusion that wife's role as homemaker was jointly accepted. See *Hokin v. Hokin*, 605 N.W.2d 219, 228 (Wis. Ct. App. 1999) (applying the principle that "a court should respect the choices a couple makes during a marriage about whether one of them, and if so, which one, should remain home to care for children or for other reasons, rather than work outside the home" to the factual scenario in which the husband "left the decision about working outside the home to [the wife], and she chose not to do so"); cf. *Gray v. Gray*, 658 So. 2d 607, 608-10 (Fla. Dist. Ct. App. 1995) (concluding that the parties' "marital arrangement called for the former wife to remain at home, forego her career, and take care of the children for the majority of their eighteen-year marriage" despite husband's testimony that "he encouraged the former wife to go back to work"), *abrogated on other grounds by Harris v. Harris*, 760 So. 2d 152, 152 (Fla. Dist. Ct. App. 2000).

¶ 13. It is also not clear that husband was substantially prejudiced by this particular finding. Although the court declined to fault wife for her limited work outside the home, the court readily acknowledged that the respective merits "point significantly in [husband's] favor." In its findings, the court recognized wife's shortcomings: among other things, that she was dysfunctional at times and struggled in her role as homemaker, that she had problems with alcohol causing two DUI convictions, that she was convicted of assaulting husband in 1999, that she had difficulty controlling her emotions and suffered from depression, and that she was financially irresponsible when husband was deployed to Iraq. Hence, we cannot agree with husband's contention that the court did not make adequate findings concerning wife's shortcomings and the statutory marital-property factors related to those shortcomings. The court plainly stated that the statutory factors concerning respective contributions to the marriage and respective fault weighed significantly in favor of husband.

¶ 14. Husband argues, however, that the court abused its discretion by, in effect, ignoring those factors that weighed in his favor and instead distributing the marital property based on the disparity in financial circumstances between the parties and the length of the marriage. In husband's view, because of wife's

minimal contribution to the marriage and her lack of respective merits, neither the length of their marriage nor the disparity in their financial circumstances warranted giving her a significant portion of the parties' marital assets.

¶ 15. We conclude that the court's property award does not fall outside its broad discretion. Section 751 of Title 15 gives the court the authority to equitably divide marital assets after considering all relevant factors, including those listed therein. "As we have often noted, property division is not an exact science, and the trial court has broad discretion in considering the statutory factors and fashioning an appropriate order." *Cabot v. Cabot*, 166 Vt. 485, 500, 697 A.2d 644, 654 (1997). "The court need not specify the weight given to each factor, but is required only to provide a clear statement as to what was decided and why." *Jakab v. Jakab*, 163 Vt. 575, 585, 664 A.2d 261, 267 (1995). Here, the court, both directly and indirectly, explained the basis of its decision and why it was equitable. See *Wade v. Wade*, 2005 VT 72, ¶ 23, 178 Vt. 189, 878 A.2d 303 ("As trier of fact, the family court was in the best position to assess the merits of the parties' contentions, and its decision addresses the relevant statutory factors. Therefore, we cannot say that the court abused its discretion in fashioning the property award in this case.").

¶ 16. In this case, the court described a variety of factors influencing its decision. To begin with, while recognizing wife's numerous shortcomings, the court acknowledged that she had served as a homemaker and an occasional outside worker in a long-term marriage. The bottom line is that, for better or for worse, the parties raised two children together over the course of twenty years. Although, as the court acknowledged, husband certainly contributed more to the marriage over that time than wife, wife was also entitled to a share of the marital assets for her part in the lengthy marriage. In the court's view, these marital assets were relatively minimal despite husband's significant income in the latter part of the marriage. Thus, although wife's percentage of the marital assets appears to be high, the court recognized that the total amount of the assets was relatively small, considering the length of the marriage and husband's income.

¶ 17. A crucial factor, on which the trial court focused, was the vast disparity in the parties' respective financial circumstances and their respective opportunities to acquire assets in the future.

Husband is in his early forties, healthy, college-educated, in line to retire with significant benefits and a large monthly pension, and possessed of the skills to earn more on top of his retirement income if he so chooses. He also will retain significant benefits from the Army in retirement, including comprehensive health coverage. Wife, on the other hand, although also relatively young, has a history of mental-health issues, no education beyond a GED high school diploma, and no job skills other than in retail sales. At the time of the final divorce hearing, she was renting an apartment and making little more than minimum wage at a job without health benefits. By comparison, husband had recently purchased a house valued at $275,000. Thus, weighing heavily in favor of wife are several of the statutory property division factors, such as the length of the marriage, the occupation and income of the parties, the relative needs of the parties, the vast disparity of the parties' financial circumstances, the parties' comparative vocational skills and employability, and their respective opportunities to acquire capital assets in the future. See 15 V.S.A. § 751(b)(1), (3), (4), (6), (8).

¶ 18. Finally, as we discussed above, the most significant factor in dividing the marital property is the relationship between the property award and the maintenance award. See id. § 751(b)(7) (whether the property settlement is in lieu of or in addition to maintenance). The asset to be distributed — the pension — is available to meet either party's financial needs only when husband retires, no earlier than two years after the divorce judgment and possibly later. Here the court roughly synchronized the property and maintenance awards to give wife a steady income of between $1900 and $2100 per month, derived from maintenance until 2013 and then from husband's pension supplemented by a small amount of maintenance thereafter. Viewing the settlement as a whole, the property award was made in lieu of maintenance in order to provide a minimum income stream to wife.

¶ 19. Ultimately, this divorce called upon the judge to weigh two conflicting sets of factors, roughly describable as past merit and present need. On the one hand, husband is entitled to be credited for his greater relative contributions and merits; on the other hand, the length of the marriage and the asymmetry in the parties' circumstances and future prospects suggest distribution to wife. The trial court was clearly aware of these conflicting pulls, specifically noting that some of the statutory factors favored

husband — in particular, factors (10), (11), and (12) — while others favored wife — in particular, factors (1), (3), (4), (6), (7), and (8). As we have frequently noted, there is no mathematical formula for balancing these factors, and the court used its judgment as to what would be equitable. See *Victor v. Victor*, 142 Vt. 126, 130, 453 A.2d 1115, 1117 (1982) ("[T]he distribution of property is not an exact science and does not always lend itself to a precise mathematical formula; all that is required is that such distribution be equitable."). Given the totality of the circumstances, the court did not abuse its considerable discretion in awarding wife 75% of the marital portion of husband's military pension, which amounts to a little over 40% of his total pension in order to create an income stream that would meet wife's minimum needs above her employment income. We find no basis to second guess the court's choice of the balancing point. See *Soutiere v. Soutiere*, 163 Vt. 265, 271, 657 A.2d 206, 209-10 (1995) ("The court has considerable discretion in making a property award, reversible only on a showing there is no reasonable basis to support it.").

■ ¶ 20. Husband also argues that the court abused its discretion by awarding wife permanent maintenance. Once again, he contends that the court focused exclusively on wife's financial needs and not, as it was required to do, on the quality of her contributions to the marriage. While acknowledging that this was a relatively lengthy marriage in number of years, husband contends that wife contributed little to the marriage during those years and thus was not entitled to permanent maintenance. In husband's view, wife is not entitled either to compensatory maintenance because of her failure to contribute to the marriage nor rehabilitative maintenance because of her failure to identify a rehabilitative plan, such as furthering her education or engaging in some sort of training. Again, we conclude that the court's maintenance award fell within its broad discretion. See *Golden v. Cooper-Ellis*, 2007 VT 15, ¶ 47, 181 Vt. 359, 924 A.2d 19 ("The family court has considerable discretion in ruling on maintenance, and the party seeking to overturn a maintenance award must show there is no reasonable basis to support the award to succeed on appeal.").

¶ 21. The trial court may award maintenance, either rehabilitative or permanent in nature, if it finds that the spouse seeking maintenance lacks sufficient income or assets to provide for his or her reasonable needs, including property awarded under § 751,

and is unable to support himself or herself at the standard of living established during the marriage. 15 V.S.A. § 752(a). The court is authorized to award maintenance in an amount and for a time as "the court deems just" after considering all relevant factors, including the recipient party's financial resources and ability to meet his or her needs independently, the time and expense necessary for that party to obtain any needed education to find appropriate work, the standard of living established during the marriage, the duration of the marriage, the age and physical and emotional condition of each spouse, the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs while meeting those of the recipient spouse, and the effect of inflation on the cost of living. *Id.* § 752(b).

¶ 22. In this case, the evidence plainly demonstrated that wife had extremely limited financial prospects, in marked contrast to husband, and would need financial assistance to live independently or even approach the standard of living established during the marriage. At the time of the divorce, wife had a net income of $1040 per month. Husband, by comparison, had a net monthly income of $7343. As of March 2013, husband could retire from the Army and receive a retirement income of $3466. Of this, $1440 was awarded to wife, and the remaining $2026 was awarded to husband. At that point husband would be forty-five years of age, and he expected to work another twenty-two years so he could obtain social security benefits as a second source of retirement income. If he earned only half the income that he received while in the Army, he would still have about double the income of wife. If he continued to earn the same amount as in recent years, he would have triple the income of the wife.

¶ 23. As we said at the outset of this decision, we must look at the property award and the maintenance award together. The court awarded wife a higher level of maintenance while husband earned his full salary and then reduced it to $500 per month around the time of husband's presumed retirement,[2] making her income roughly the same before and after husband's retirement.

---

[2] The award created a high risk for wife. There was no certainty to husband's retirement date. The findings indicate that he could remain in the Army for two additional years as of right, and could apply to remain for a longer period. If husband failed to retire when he was eligible, wife would be left with a small maintenance award of $500 per month, but no access to the share of husband's pension.

Contrary to husband's argument, the combined income from the pension and the maintenance award is not overly generous, if generous at all. Even with both awards, wife would not reach the standard of living that she enjoyed during the marriage. See *id.* § 752(a)(2) (maintenance is appropriate if recipient cannot support himself or herself "at the standard of living established during the civil marriage"). In our view, the court reached its result by factoring in the considerations that husband faults it for not relying upon. In doing so, the court acted within its wide discretion.

■■ ¶ 24. Husband also argues, and wife concurs, that the case must be remanded for the trial court to apply an automatic inflation adjustment to the permanent maintenance award that takes into account his income. "Under 15 V.S.A. § 752(b)(7), the trial court must consider 'inflation with relation to the cost of living' when fashioning a maintenance order." *Bell v. Bell,* 162 Vt. 192, 200, 643 A.2d 846, 851 (1994). In *Roya v. Roya,* we upheld automatic adjustments for the cost of living, but we imposed two conditions on such automatic adjustments. 145 Vt. 488, 491-92, 494 A.2d 132, 134-35 (1985). First, an automatic adjustment should offer a workable formula for calculating increases in cost of living. See *id.* at 491, 494 A.2d at 134-35 ("An adequately clear order should set forth a simple and workable formula which can be used each year to determine what the change in the payments will be. The formula must provide for adjustments to be made in a manner which is based on readily obtainable information."). We noted that the Consumer Price Index (CPI) provides "readily obtainable objective information" to use in calculating adjustments. *Id.* at 491, 494 A.2d at 134. Second, we required that such an award "provide for situations in which the payor's income does not keep pace with inflationary increases in the cost of living." *Id.* at 491-92, 494 A.2d at 135. As we explained in *Bell,* this means that any adjustment formula must include a mechanism for considering whether the payor's income has kept pace with the inflationary changes. See *Bell,* 162 Vt. at 200, 643 A.2d at 851 ("[E]ven an 'automatic' cost-of-living award may not be effectuated in the absence of an increase in the payor's income, and the award must incorporate some mechanism for handling this circumstance.").

■■ ¶ 25. Here, the trial court ordered that the $500 permanent maintenance award be increased automatically every three years

"by 7.5%, or 3 times the annual CPI index for the most recent year, *whichever is greater.*" This adjustment formula fails both the requirements that our previous cases set forth. For this reason, the present automatic adjustment provision must be struck and the matter remanded for the trial court to amend the provision.

¶ 26. This first problem, which neither party raises but which we note in order to provide guidance on remand, is that the court's formula does not actually track inflationary increases in the cost of living. Although the court's intent seems to have been to award $500 per month, adjusted for inflation, this is not what the formula produces. We do not object to the court's choice, at least on the facts of this case, to make adjustments only every three years. Such a choice is compatible with the aim of administrative efficiency motivating the use of a formula. If adjustments are to be every third year, however, they should adjust based on the inflationary changes over the intervening three year period. In its order, we assume that what the court meant by "the annual CPI index for the most recent year" is the percent change in the CPI over the previous year. Three times this value does not equal the change in buying power over the three year period, which is captured instead by the percent change in the CPI over the entire three years. In this case, the court should have used this latter value. The court's formula could yield adjustments that are substantially smaller or larger than the inflationary changes. Cf. *Braun v. Greenblatt*, 2007 VT 53, ¶ 16, 182 Vt. 29, 927 A.2d 782 (rejecting an escalation clause as "unworkable" where it did not "clearly articulate" a formula for "inflation with relation to the cost of living"). And this difference could be compounded because each adjustment is based on the previously calculated payment. This compounding feature of the formula also affects the 7.5% floor imposed by the trial court, meaning that the baseline for successive CPI adjustments could be higher than the CPI-adjusted maintenance award at the time of the court's order. This does not mean that a court may not place a floor on inflation adjustments, but only that the floor should not create the possibility of compounding distortion. Two types of floors that would not raise this difficulty would be a set amount — e.g., the payment amount shall not drop below $500 — or a fixed annual percentage change that is tied to the original amount — e.g., the adjusted payment shall never represent less than a 2% annual increase from the initial amount.

■ ¶ 27. The second problem, which both parties recognize, is that the formula does not take into account the possibility that husband's income might fail to keep pace with the inflationary increases in the cost of living. As *Roya* and *Bell* explain, there must be some safety valve for husband should his income remain stagnant despite the cost of living increases. Thus, on remand, the court must fashion an adjustment formula that factors in consideration of husband's income. Although we do not mandate a specific calculation, it may be helpful for us to provide some guidance as to what would satisfy the requirement from *Roya* and *Bell*. One satisfactory provision would be a ceiling on adjustments that is tied to the change in husband's income — for example, if husband's source of income does not change, the percentage increase from the time of the order shall not exceed the percentage change in husband's income over that time plus 1%. Alternatively, a court might place a cap on the percentage of husband's income that the maintenance represents — e.g., the upward adjustments shall not bring maintenance payments above 11.5% of husband's income. Finally, a court may, where appropriate, fashion an escalation formula that is tied directly to the payor's income. See, e.g., *Chaker v. Chaker*, 155 Vt. 20, 26-28, 581 A.2d 737, 740-41 (1990) (permitting an escalation clause tied to the increases in payor's income where it would serve judicial economy and where the other spouse had supported the payor's professional development). In short, there is no single way to comply with the requirement from *Roya* and *Bell* that the payor's income be considered, and the court on remand may consider husband's income in a variety of ways.

¶ 28. We note that these income-related adjustments assume no substantial change of income, either up or down, caused by a change of source — e.g., a new job or loss of a job. Further adjustments based on this eventuality would depend upon a showing of a real, substantial, and unanticipated change of circumstances. 15 V.S.A. § 758.

¶ 29. As a final matter, wife requests that our mandate require the trial court on remand to award her attorney's fees and costs incurred in this appeal. We decline this request. Wife may seek certain costs incurred on appeal directly from this Court pursuant to Vermont Rule of Appellate Procedure 39. Wife must, however,

direct any request for attorney's fees on appeal to the trial court on remand. See V.R.A.P. 39(f).

*We affirm the family division's order in all respects, except that the matter is remanded for the court to amend the maintenance award's automatic inflation-adjustment provision.*

¶ 30. **Burgess, J.,** dissenting in part. While the family division enjoys broad discretion in dividing marital property, the court's findings must still support its conclusions. In this case, its findings that wife invested little or nothing in the domestic enterprise generally, that she contributed virtually nothing economically to the marital estate, and lent little support in child rearing, do not justify the windfall of 75% of the marital portion of husband's military pension to wife. Because the parties' respective marital contributions weigh heavily on the equities in this case, and with a comment about the related maintenance award under these circumstances, I respectfully dissent from affirming the court's lopsided, but unsupported, pension award.

¶ 31. It is not disputed that wife added little to the marriage's commonwealth. She earned no real money; the court found that wife had "no substantial work history or experience" and that husband was "the primary, if not sole source of all family income." Wife's claims of nonmonetary contribution as a homemaker were unproven; the court concluded only that her claims were "questionable." In contrast, the court specifically found that husband, in addition to breadwinning, "was called on many times, and throughout the parties' time together to become involved with the children's day-to-day care and supervision." As to the twenty years of marriage overall, the court found this to be superficial and but a marriage "on paper."

¶ 32. Compared to the findings and conclusions of the trial court, the majority's characterizations of this marriage as long term, and of the court's marital property distribution as warranted by her homemaking, shared child rearing and occasional employment, are wrong. *Ante,* ¶ 16. According to the trial court, the length of the marriage was a matter of form over substance. The trial court did not, contrary to the majority's perception, credit wife as a homemaker. Also at odds with the majority's somewhat ambiguous recitation that the parties raised their children "together," *id.,* were the trial court's findings that wife "did not in fact fit, or easily fulfill" the role of caretaker and that

husband had to frequently fill in for wife's failure to carry her share of parenting. Nor did the court explain its generous pension distribution in terms of wife's negligible outside earnings.

¶ 33. The majority suggests the court found that husband "tacitly accepted" wife's decision not to work, *ante,* ¶ 11, but this is also inaccurate. At best, the court's findings were equivocal. What the court actually said was that "[wife's] lack of employment during most years of this marriage was essentially a mutual choice, by default and inaction" and that wife's failure to work resulted from "the parties' choice (by attrition, if not positive decision)." Absent actual agreement or enforceable alternatives, "default and inaction" cannot really constitute a "mutual choice." Finding no positive decision shared by the parties, neither the court nor the majority can describe any erosion by attrition of husband's stated preference that wife work. Neither the court nor the majority posit what other option husband would exercise. Absent the power to command otherwise, how does one spouse "choose" for the other not to work or assume a fair share of domestic chores when the other refuses to do so? Shall the productive spouse impose a stricture like Captain John Smith's at colonial Jamestown that the noncontributing member of the enterprise may not eat unless he or she first works? The majority's rule compels a spouse to divorce an idle partner sooner rather than later, lest the nonparticipating spouse acquire a substantial portion of the marital estate simply by being married, nominally, for a long time to the other.

¶ 34. Such a result might be justified in circumstances of illness or disability, but those are not presented here. The court noted that wife struggled with alcohol, but wife admits to no alcohol problem. Wife suffers from depression as well, but there are no findings that she was unable to work, incapable of working sooner or unresponsive to treatment. According to the court, wife invested virtually nothing in the marriage's domestic, economic, or parental efforts. The court recognized that husband tolerated a "tough slog" and assumed "much more of the weight and responsibility to keep the family relatively intact, and minimally functioning, until the children had become adults." Wife had little or no sweat-equity in the marriage to redeem.

¶ 35. Wife may not have been, as observed by the court, "at fault" in the traditional sense for her inactions, but at the same time her financial insecurity cannot be attributed to either her

husband or her marriage. This situation is nothing like the cases cited by the majority upholding property divisions based on a couple's arrangement for the wife to "remain at home, forego her career, and take care of the children," or "choices a couple makes during a marriage about whether one of them, and if so, which one, should remain at home to care for children or for other reasons, rather than work outside the home." *Ante*, ¶ 12 (quoting *Hokin v. Hokin*, 605 N.W.2d 219, 228 (Wis. Ct. App. 1999)). The majority weighs other statutory factors, such as wife's comparatively vast disadvantage in earning, vocational, occupational, and wealth opportunities, "heavily" in her favor, but with no discernible regard for equity. Nothing in the findings or evidence indicate that wife's needy circumstance and low earning potential are in any way related to the marriage. That husband managed to cover earnings, child rearing, and domestic responsibilities in the face of wife's failure to contribute meaningfully to any of those areas is no fair basis for awarding her the lion's portion of his pension. This allocation of the sole marital asset is plainly inequitable compared to the findings and, so, fails to meet the objective of 15 V.S.A. § 751. See *Myott v. Myott*, 149 Vt. 573, 579, 547 A.2d 1336, 1340 (1988) (explaining that distributions of marital property need not be equal, but "must be equitable").

¶ 36. The majority opines, probably correctly, that the pension was awarded in lieu of maintenance due to its income stream in order to supplement the court's spousal maintenance order after husband's retirement. Nevertheless, the pension allocation remains unjustified on its own terms and cannot be rationalized as a substitute for maintenance. Property distribution and maintenance awards can be interdependent, see 15 V.S.A. §§ 751(b)(7), 752(a)(1) (treating property distribution and maintenance orders as interrelated), and a remand for one requires reassessment of the other. See *Downs v. Downs*, 154 Vt. 161, 168, 574 A.2d 156, 159 (1990) (noting that property and maintenance decisions are so closely related that both matters must be reconsidered on remand "to allow the trial court leave to revise it if necessary"). Review of maintenance, however, does not necessarily require an increase to compensate for a reduction in property distribution.

¶ 37. Had there been a remand, the circumstances of this case would warrant an additional comment as to maintenance. Both the trial court and majority seem to assume that, regardless of wife's choices and the irrelevance of the marriage or her husband to her

impecuniousness, she is nevertheless entitled to husband's subsidy as his resources allow to meet her needs and even to maintain her marital standard of living. The trial court explained its understanding that § 752 maintenance is arrived at by looking "solely at respective financial needs and corresponding 'ability to pay'" entirely divorced from "equitable concerns." This also was error.

¶ 38. Spousal maintenance under § 752 is not to be awarded so woodenly. Maintenance awards are not mandated, but "may" be ordered, 15 V.S.A. § 752(a), in the court's discretion. See *McCrea v. McCrea*, 150 Vt. 204, 207, 552 A.2d 392, 394 (1988) (reiterating that "[a]n award of maintenance is subject to the trial court's discretion" (quotation omitted)). To be sure, the court's recognition of the standard of living and length of the marriage, as well as the parties' comparative age, health, employability, need, resources, and ability to pay, are factors considered under the statute, but the list is not exclusive. *Id.* § 752(b). The maintenance award "shall be in such amounts and for such periods of time as the court deems *just*, after considering *all* relevant factors." *Id.* (emphases added).

¶ 39. This Court has declared, without distinction or much discussion, that "fault or punishment" is not a "valid consideration[] for awarding maintenance." *Jenike v. Jenike*, 2004 VT 83, ¶ 9, 177 Vt. 502, 857 A.2d 798 (mem.); see also *Naumann v. Kurz*, 152 Vt. 355, 361, 566 A.2d 1342, 1345 (1989) (holding that "property in lieu of maintenance award cannot be used to punish . . . or reflect fault"). Surely the court should not employ maintenance punitively, since punishment is irrelevant to any purpose of spousal support. On the other hand, labeled "fault" or not, taking into account a spouse's responsibility for his or her *own* economic situation arrived at independently of the marriage serves, rather than defeats, the objective of § 752 to establish a "just" maintenance obligation for the other spouse. This is not a matter of moral judgment, but an acknowledgment that the success of one spouse may be no explanation for the other's lack of earning capacity. Having derived no benefit or advantage from the comparative lack of effort by the other, the industrious spouse should not be made to pay for the other's dereliction. At the least, *Jenike, Kurz,* and the statute's requirement of a "just" maintenance award should be understood to proscribe punishing one spouse for subsidizing the other for twenty years, without any exchange, justifiable expectation, or reliance on the part of the

other, by ordering that the subsidy be continued in the form of spousal maintenance.

¶ 40. Under the facts found below, the § 752(b) factors should not be weighed with a view towards achieving economic parity between the parties at the expense of one spouse for the unearned benefit of the other. This is but the obverse of an element long read into the statute by this Court that "[o]ne of the purposes of maintenance under the act is recompense for the contributions of a homemaker to the family's well-being which was not otherwise made (presumably in property division)," a purpose which is "evident from some of the factors used in determining the amount of maintenance — particularly the length of the marriage." *Klein v. Klein*, 150 Vt. 466, 474, 555 A.2d 382, 387 (1988) (quotation omitted) (taking into account that "for 18 years [the wife] dedicated her life to raising the children . . . and supporting [her husband] in development of his law practice"); see also *Clapp v. Clapp*, 163 Vt. 15, 21, 653 A.2d 72, 76 (1994) (reaffirming "past homemaker contributions" as a basis for maintenance). Consistent with this approach is maintenance "based in part on a recognition of contributions made by one spouse to the other's advancement" or to the other's "education, training, and enhanced earning capacity." *Klein*, 150 Vt. at 474, 555 A.2d at 387 (quotations omitted).

¶ 41. Thus, a maintenance award falls within the trial court's discretion due to a "wife's limited ability to establish herself in the workforce after many years of foregoing that opportunity by fulfilling her role as a mother, wife, and homemaker, and after considering the marital assets distributed to her." *Kasser v. Kasser*, 2006 VT 2, ¶ 39, 179 Vt. 259, 895 A.2d 134. It is no less consistent with the statute to temper a contributing spouse's maintenance obligation by the other spouse's lack of contribution and the absence of a marital relationship in fact between the parties for any material period of time. Here, based on the findings, wife proved no sacrifice of opportunity on her part and the length of the marriage was meaningless. On these facts, no recompense is due.

¶ 42. I am authorized to state that Justice Johnson joins this dissent.